A.H., Appellant,

v.

STATE of Alaska, DEPARTMENT OF
HEALTH & SOCIAL SERVICES,
Appellee.

No. S–9412.

Supreme Court of Alaska.

Oct. 20, 2000.

Jan A. Rutherdale, Assistant Attorney General, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before FABE, Chief Justice, MATTHEWS, EASTAUGH, BRYNER, and CARPENETI, Justices.

### OPINION

FABE, Chief Justice.

## I. INTRODUCTION

A.H. appeals the superior court's decision to terminate his parental rights as to his two daughters. The superior court determined that A.H.'s children were children in need of aid due to neglect, domestic violence, and mental illness; that A.H. had not remedied the conduct that placed his children at risk of harm; that the State made active remedial efforts which proved unsuccessful; that continued custody by A.H. would likely result in serious damage to the children; and that it was in the children's best interests to terminate A.H.'s parental rights. Because the record supports each of the superior court's findings, we affirm the superior court's decision.

## II. FACTS AND PROCEEDINGS

### A. Factual Background

A.H. and M.H. met in Juneau in 1991, where they both were undergoing treatment with the Juneau Alliance for the Mentally Ill (JAMI). They married in Sitka in 1994. They had their first daughter, T., in 1995 and lived in Anchorage for about six months before returning to Sitka.

While the family lived in Anchorage, the Department of Health & Social Services, Division of Family & Youth Services (DFYS) reported that A.H. and M.H. were neglecting their daughter, failing to provide adequate food, and that A.H. had not been properly taking his psychotropic medications. Consequently, DFYS made referrals to various service agencies, including the Public Health Service, the Agency for Families Enhancement Coordination Teams (AFECT), and New Beginnings.

When the family returned to Sitka, DFYS received more reports concerning the H.s' care of their daughter. Both A.H. and M.H. were diagnosed with paranoid schizophrenia. They also had problems with money and housing. During this time, A.H. was hospitalized for his mental condition. There were also reports that A.H. and M.H. had harmed T. while living in Sitka. The H.s did not have any food, they improperly mixed the baby formula, and A.H. allegedly dropped the baby "a short distance, six inches, onto the bed ... [w]hile he was hallucinating." Although a DFYS worker in Sitka began to coordinate services, the H.s decided to move to Juneau.

Several agencies became involved with the H.s in Juneau, including the Southeast Alaska Regional Health Center (SEARHC), for medical services; Healthy Families, for parenting services; Juneau Public Health, for nursing services; City and Borough of Juneau, for mental health services; and the

Infant Learning Program (ILP), for child development services. DFYS put together a team to coordinate these services, and the team met to discuss the H.s' problems with housing and mental health. M.H. was pregnant again by this time, and the H.s' second daughter, K., was born in October 1996 in Juneau.

From September 1996 to July 1997, DFYS held periodic treatment meetings with the H.s and various service providers. After experiencing housing difficulties and living with relatives, the H.s moved into an apartment in March 1997. For the next three months, a Child Care and Family Resources (CCFR) worker provided intensive in-home parenting and homemaking services for the H.s, working with them three or four times a week.

During their time in Juneau, the H.s continued to have difficulty caring for their children. Both T. and K. are developmentally delayed and have had significant health problems. The superior court found that the H.s had provided neglectful care in the areas of medical attention, food, clothing, shelter, basic hygiene, and environment. There were also two incidents of domestic violence, one in which A.H. threatened to hit M.H.—who was holding T.—with a backpack and then grabbed her wrists, and one in which M.H. and A.H. engaged in a physical "scuffle" and had to be separated by the police for the night.

A.H. also failed to take his anti-psychotic medication consistently, and he continued to have disturbing and paranoid delusions. For example, A.H. claimed to have seen "the devil" nursing K., black worms crawling out of the sink, and people walking in and out of their house at night.

In July 1997 DFYS petitioned for temporary custody under the statutes governing children in need of aid (CINA) and the Indian Child Welfare Act,[1] and the superior court granted the order. After the 1997 order for temporary custody, T. and K. moved several times to different foster homes. Because DFYS could not find a stable home for the children in Juneau with relatives or tribal members, it placed them with a non-native, licensed foster parent, in Sitka in December 1997. After this placement, DFYS provided transportation and lodging for the H.s to visit their children quarterly, although the H.s were free to visit more frequently using their own funds. The foster parent is a special education teacher and has indicated that she wants to adopt the H. children.

But even after DFYS assumed custody of the children, A.H. continued to have difficulties. For example, in March 1998 the H.s used an agency check—which was intended to cover traveling expenses to visit their children—to buy alcohol. Also, in June 1998 A.H. pled no contest to assaulting M.H. As a condition of his probation, A.H. agreed to attend anger management counseling, but he broke probation by failing to attend.

A.H. also has not maintained sobriety, has not consistently taken his anti-psychotic medication and consequently has suffered from paranoid and delusional thoughts. In July 1999 A.H. was arrested for stalking M.H. and assaulting her boyfriend.

A.H. and M.H. separated in February 1998 and have lived apart ever since.

B. *Procedural History*

The State filed a Petition for Adjudication and Disposition of Children in Need of Aid on July 25, 1997. On July 28, 1997, the court signed the Order for Temporary Custody and awarded temporary custody to the State. M.H. and A.H. stipulated to adjudication and temporary custody pending the disposition hearing on September 17, 1997. The court held the disposition hearing on January 16, 1998, and entered the Order of Disposition Upon Finding a Child in Need of Aid, awarding the State custody for up to two years.

Then, on March 24, 1999, the State filed a Petition for Termination of Parental Rights of both parents. Trial was in July, and on September 8, 1999, the court issued its Findings of Fact and Conclusions of Law, terminating A.H.'s but not M.H.'s parental rights. After a hearing on visitation and placement later that month, the court allowed M.H. limited visitation during the summer, but

1. *See* AS 47.10.011; 25 U.S.C. § 1915 (1994).

ordered no further visits by A.H. In addition, the court ordered the children to remain in their current foster home. The court also ordered the establishment of a visitation schedule so that the children could see their maternal grandparents in Angoon.

A.H. appeals the order terminating his parental rights.

## III. STANDARD OF REVIEW

 In CINA cases, this court upholds the superior court's factual findings unless they are clearly erroneous.[2] "Factual findings are clearly erroneous if a review of the entire record leaves us 'with a definite and firm conviction that a mistake has been made.' "[3] In addition, whether the superior court's factual findings comport with the CINA statutes is a question of law, which this court reviews de novo.[4]

## IV. DISCUSSION

 Under AS 47.10.088, a court may terminate parental rights "for purposes of freeing a child for adoption or other permanent placement."[5] In order to terminate, the court must find by clear and convincing evidence that the child is in need of aid under AS 47.10.011, and that the parent has not

remedied the conduct or conditions that place the child at substantial risk of harm.[6] In addition, the court must find by a preponderance of the evidence that the department "has made reasonable efforts to support the family and foster the safe return of the child to the family home."[7] And in determining whether to terminate parental rights, "the court shall consider the best interests of the child."[8]

A. Did the Superior Court Err in Finding that the Children Were Children in Need of Aid?

The superior court found clear and convincing evidence that T. and K. were children in need of aid under four provisions of AS 47.10.011. A.H. appeals the findings underlying the three bases upon which the superior court made its determination: (1) that the H .s subjected their daughters to neglect under AS 47.10.011(9); (2) that A.H. and M.H. placed the children at substantial risk of mental injury as a result of repeated exposure to domestic violence under AS 47.10.011(8)(B)(iii); and (3) that he has a mental illness of a nature and duration that places his daughters at substantial risk of

---

**2.** See A.B. v. State, Dep't of Health & Soc. Servs., 7 P.3d 946, 950 (Alaska 2000).

**3.** Id.

**4.** See D.M. v. State, Div. of Family & Youth Servs., 995 P.2d 205, 207 (Alaska 2000).

**5.** AS 47.10.088(a).

**6.** See AS 47.10.088(a)(1)(A)-(B)(i). Also, in determining whether the parent has remedied the conduct or conditions that place the child at substantial risk of harm, AS 47.10.088(b) provides that

the court may consider any fact relating to the best interests of the child, including
(1) the likelihood of returning the child to the parent within a reasonable time based on the child's age or needs;
(2) the amount of effort by the parent to remedy the conduct or the conditions in the home;
(3) the harm caused to the child;
(4) the likelihood that the harmful conduct will continue; and
(5) the history of conduct by or conditions created by the parent.

**7.** A.B. v. State, Dep't of Health & Soc. Servs., 7 P.3d 946, 950 (Alaska 2000); see also AS 47.10.086. AS 47.10.086(a) provides, in relevant part:

[T]he department shall make timely, reasonable efforts to provide family support services to the child and to the parents ... of the child that are designed to prevent out-of-home placement of the child or to enable the safe return of the child to the family home, when appropriate, if the child is in an out-of-home placement. The department's duty to make reasonable efforts under this subsection includes the duty to
(1) identify family support services that will assist the parent or guardian in remedying the conduct or conditions in the home that made the child a child in need of aid;
(2) actively offer the parent ... and refer the parent ... to, the services identified under (1) of this subsection; the department shall refer the parent ... to community-based family support services whenever community-based services are available and desired by the parent ...; and
(3) document the department's actions that are taken under (1) and (2) of this subsection.

**8.** AS 47.10.088(c).

physical harm and mental injury under AS 47.10.011(10).

■ A.H. does not dispute that his children were in need of aid when the court initially made that determination in 1997. He states: "[t]he court could have properly found by clear and convincing evidence that the children were subjected to conduct or conditions described in AS 47.10.011 and were therefore CINA." Indeed, the H.s stipulated in 1997 that their children were CINA. Because A.H. admits that his children were CINA, his argument on this issue is unavailing. And the record supports the superior court's findings that A.H.'s children were CINA due to neglect, domestic violence, and mental illness, although any one factor suffices to render the children CINA under the statute.[9]

### 1. Neglect

The superior court found that M.H. and A.H. subjected their daughters to neglect by failing to provide them "with adequate food, clothing, shelter, medical attention or other care and control necessary for the children's physical and mental health and development."[10]

In this case, A.H. agrees that he has subjected his daughters to neglect and that they were children in need of aid. He states: "[t]here is no dispute that the children were unintentionally subjected to neglect by the [H.s]. In fact, they stipulated that the children were CINA, in part because of neglect." And the record supports the superior court's findings that the H.s subjected their children to neglect.

■ A.H. next argues that "there is no rational basis for a finding that ... [A.H.] would continue to subject his children to neglect." But AS 47.10.088(a)(1)(A) provides that the court may terminate parental rights if it finds by clear and convincing evidence that "the child *has been* subjected to conduct

or conditions described in AS 47.10.011 [Children in Need of Aid]."[11] As this court has stated, the inquiry regarding CINA status at a termination hearing involves "all evidence of the parent's pre-termination hearing conduct, including evidence of parental conduct predating the CINA adjudication."[12] Thus, the statute only requires a finding that the child "has been" subjected to neglect,[13] and in this case, A.H. admits that his children were subjected to such neglect.

### 2. Domestic violence

■ A.H. next disputes the superior court's determination that the children were CINA under AS 47.10.011(8)(B)(iii) because the H.s' conduct placed the children at substantial risk of mental injury as a result of repeated exposure to domestic violence. Although A.H. states that "it is clear that the children, individually or collectively, have been exposed to domestic violence on at least two occasions," he argues that two incidents "[do] not rise to the level of 'repeated exposure' necessary to a finding under AS 47.10.011(8)(B)(iii)." Moreover, he argues that even if two incidents did constitute repeated exposure, any risk of further exposure to domestic violence "has been substantially reduced due to a change in circumstance," namely, that the H.s are now separated.

Alaska Statute 47.10.011(8)(B)(iii) states that a child is in need of aid when the parent has placed the child at substantial risk of mental injury as a result of "repeated exposure to conduct by a household member ... against another household member that is a crime" under domestic violence laws. In addition, we have recognized that because witnessing domestic violence has a "devastating impact" on children, domestic violence need not be directed toward the child or signify a significant risk of physical harm to a child to

---

9. *See* AS 47.10.011.

10. AS 47.10.011(9) provides that a court may find CINA status when it finds "conduct by or conditions created by the parent ... have subjected the child ... to neglect."

11. AS 47.10.088(a)(1)(A) (emphasis added).

12. *D.M. v. State, Div. of Family & Youth Servs.,* 995 P.2d 205, 209 (Alaska 2000).

13. *See id.*

support a CINA finding.[14]

Here, the superior court found that on August 21, 1996, A.H. almost hit M.H. and T. with a backpack during an altercation. This incident resulted in A.H. being convicted of the offense of disorderly conduct. The court also found that on July 23, 1997, M.H. and A.H. had a physical altercation in their home while the children were present, and that "[t]he children were in extreme distress as a result of this incident, screaming and in a complete state of shock for hours after the altercation ended." The record supports these findings.

Nor does A.H. dispute these findings. In fact, with regard to the backpack incident, he states that he "actually, although accidentally, struck" T. with the backpack. With regard to the July 23, 1997 incident, A.H. states that it "was an altercation between [the parents] where the children were traumatized by the incident." A.H. also acknowledges that there were other reported incidents of domestic conflict. But he maintains that "there is no record that the children may have been present."

Because the CINA status inquiry at the termination hearing involves "all evidence of the parent's pre-termination hearing conduct, including evidence of parental conduct predating the CINA adjudication,"[15] and because A.H. admits to multiple acts of domestic violence which the record reflects, the superior court did not err in concluding that A.H.'s acts of domestic violence against M.H. rendered his children CINA.

### 3. *Mental illness*

 The superior court also found clear and convincing evidence that A.H.'s mental illness formed the basis for a finding that his children were CINA. The court found that A.H. suffers from paranoid schizophrenia, the nature and duration of which is "serious and life-long." The court also found that "[a]s a result of this illness, [A.H.] has expe-

rienced hallucinations and delusions and a deteriorating ability to function in society."

This court has stated that "while mental illness *alone* cannot form the basis of a termination order, when 'the record links the [parent's] continuing mental illness with his past instances of extreme neglect' there may be a basis for finding that 'improper parental conduct [is] likely to continue.' "[16] In this case, the superior court found that A.H.'s delusions have directly impacted his family, creating "a substantial risk" that A.H. will physically harm the children.

In addition, the court found:

In part due to his mental illness, [A.H.] has great difficulty in meeting his own needs, much less the needs of his children. [A.H.] is unable to maintain steady housing, employment, financial solvency and social relationships.

. . . .

[T]he court finds that [A.H.'s] mental illness impairs his ability to parent. Given the children's vulnerability due to their young age and developmental disabilities, his mental illness has resulted in a substantial risk of physical and mental injury to the children while they were in his care and would result in such harm if the state had not removed them from his care.

The record supports the court's findings. Thus, the superior court did not err in finding that A.H.'s mental illness has resulted in a substantial risk of physical and mental injury to the children.

The termination statute requires a determination that the children were CINA based on any of the factors listed in AS 47.10.011.[17] In this case, the superior court based its CINA finding on three separate bases: neglect, domestic violence, and mental illness. Because the record supports each of these bases, we conclude that the superior court did not err in determining that the children were CINA.

---

14. *In re J.A.*, 962 P.2d 173, 178 (Alaska 1998).

15. *D.M. v. State, Div. of Family & Youth Servs.*, 995 P.2d 205, 209 (Alaska 2000).

16. *J.P.W. v. State*, 921 P.2d 604, 608 (Alaska 1996).

17. *See* AS 47.10.088(a)(1)(A).

B. *Did the Superior Court Err in Finding that A.H. Had Not Remedied the Conduct and Conditions that Placed the Children at Risk of Harm?*

Under AS 47.10.088, a court may terminate parental rights if it finds that the parent "has not remedied the conduct or conditions in the home that place the child at substantial risk of harm," [18] or if the parent "has failed, within a reasonable time, to remedy the conduct or conditions in the home that place the child in substantial risk so that returning the child to the parent would place the child at substantial risk of physical or mental injury." [19]

■ A.H. argues that he has made an effort to apply what he has learned through agency services, and that he has never had a reasonable opportunity to demonstrate that he has remedied the conduct or conditions in the home that placed his children at substantial risk of harm. DFYS responds that to the contrary, it gave A.H. "several years, both before and after the children were removed from the home, to demonstrate that he could remedy the conduct or conditions in the home that place the child at substantial risk of harm."

The superior court found clear and convincing evidence that A.H. has not remedied the conduct and conditions that placed his children at risk of harm. Specifically, the court found that A.H.'s behavior "has deteriorated" since the children have been removed from his care. Each of these findings by the superior court is supported by the record:

- A.H. continues to be involved in domestic violence. In June 1998 he was convicted of assaulting M.H.
- As of October 1998, A.H. had not gone to court-ordered anger management counseling.
- In July 1999 A.H. was arrested for stalking M.H. and assaulting her boyfriend.

- A.H. has not maintained sobriety, and as of October 1998 had not gone to court-ordered alcohol counseling.
- A.H. has not consistently taken the medication that could alleviate the symptoms of his mental illness. He continues to have disturbing delusional thoughts including current delusions that revolve around computers causing bodily harm to people.
- A.H. has refused to allow service workers in the home since the children were removed and has not demonstrated that he can provide his children with a stable, safe and nurturing home.
- A.H. continues to have trouble budgeting his finances and placing the needs of his children first. In March 1998 he cashed an agency check that was meant to provide for expenses during a visit with his children in Sitka and spent that money on alcohol.
- A.H. arrived in Sitka to visit his children with no money for food during the visit.

■ Although A.H. argues that he has never had an opportunity to demonstrate his ability to apply new skills, that is not the relevant inquiry. [20] Rather, the question is whether A.H. has remedied the conduct or conditions that placed his children at substantial risk. [21] A.H. asserts that he has made an effort to apply what he has learned, including preparing balanced meals and developing skills in anger management, but the record suggests that A.H. did not make any real, lasting improvements in his behavior. For example, Edward Jones, a case manager for JAMI, stated that although A.H. had attempted to comply with recommendations, he "honestly can't say that [A.H.] made any real, real progress" in his "independent living skills," including such things as cleaning, shopping, hygiene, and laundry. In addition, John McClure, a DFYS social worker stated that although A.H. had been cooperative, he did not believe that A.H. could "maintain,

---

**18.** AS 47.10.088(a)(1)(B)(i).

**19.** AS 47.10.088(a)(1)(B)(ii).

**20.** *See J.P.W. v. State,* 921 P.2d 604, 608 (Alaska 1996) (superior court's predictive finding that father's neglect would continue was proper be-

cause his ongoing conduct was "well-documented in the record," even though father never had a chance to further demonstrate his conduct).

**21.** *See A.B. v. State, Dep't of Health & Soc. Servs.,* 7 P.3d 946, 952 (Alaska 2000).

sustain, any type of long-term changes." Thus, we conclude that the superior court did not err in finding that A.H. failed to remedy the conditions that placed his children at risk of harm.

C. *Did the Superior Court Err in Finding that the State Made Active Remedial Efforts that Have Proved Unsuccessful?*

 In termination proceedings, AS 47.10.086 requires the State to make reasonable efforts to identify support services and to actively offer those services to the parents.[22] In addition, because A.H.'s children are Indian children within the meaning of ICWA,[23] the State was required to prove by a preponderance of the evidence that its active efforts to provide remedial services were unsuccessful.[24]

 The superior court found by a preponderance of the evidence that "the state made timely, reasonable and active efforts to provide support services to the [H.s] to prevent out-of-home placement and, once removed from the home, to provide support services to enable the safe return of the children." The superior court found that the State satisfied its duty to provide reasonable efforts under AS 47.10.086(a) by: "(1) identifying family support services that would assist the parents in remedying the conduct or conditions in the home that made the children in need of aid; (2) actively offering the parents and referring the parents to such services; and (3) documenting such actions."

The superior court's findings on this issue occupy three pages of its decision.

The court noted, for example, that DFYS "began providing services within weeks of [T.'s] birth," and that at least fourteen different types of services by different organizations were provided for the H.s prior to the children's removal in 1997.

Also, after removal from the home, the court noted that various organizations continued to provide services to the H.s in the areas of financial management, psychiatric care, counseling, parenting and homemaking services—"until the parents declined further services," supervised visitation between the parents and children, alcohol assessments, alcohol recovery support, two paid trips to Sitka for visitation, and periodic treatment team meetings between the main service agencies. The record supports the court's findings.

In his brief, A.H. concedes that the State made "active efforts" to return his children to the home. He argues, however, that the programs and services were "very stressful" and that "the intensity of the H.s' program schedule was not reasonable." Consequently, he explains, the H.s "began isolating themselves more and more from the services available to them."

We have recognized that "a demonstrated lack of willingness to participate in treatment [is a] relevant factor[ ] in determining the reasonableness of the State's remedial efforts."[25] In this case, DFYS and other

---

**22.** AS 47.10.086(a) provides, in relevant part, that

the department shall make timely, reasonable efforts to provide family support services to the child and to the parents ... of the child that are designed to prevent out-of-home placement of the child or to enable the safe return of the child to the family home, when appropriate, if the child is in an out-of-home placement. The department's duty to make reasonable efforts under this subsection includes the duty to

(1) identify family support services that will assist the parent or guardian in remedying the conduct or conditions in the home that made the child a child in need of aid;

(2) actively offer the parent ... and refer the parent ... to, the services identified under (1) of this subsection; the department shall refer the parent ... to community-based family support services whenever community-based ser-

vices are available and desired by the parent or guardian; and

(3) document the department's actions that are taken under (1) and (2) of this subsection.

**23.** 25 U.S.C. §§ 1901–1923 (1994).

**24.** *See* 25 U.S.C. § 1912(d) (1994) (the State must make "active efforts ... to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and [show] that these efforts proved unsuccessful"); Child in Need of Aid Rule 18(c)(2) (establishing preponderance of evidence standard).

**25.** *A.M. v. State,* 945 P.2d 296, 304 (Alaska 1997) (also cautioning that "the scope of the State's duty to make active remedial efforts should be affected by a parent's motivation or prognosis before remedial efforts have commenced").

agencies provided services to A.H. in each area of concern: parenting, domestic violence, and mental health. And in order not to overload the H.s, the agencies collectively scheduled all appointments for just three days a week.

■ Because the State made a number of support services available to the H.s, the superior court did not err in determining that the State made active, reasonable efforts to promote the children's safe return to their parents. And despite these efforts, the record indicates that A.H. continued to have difficulty in his independent living skills, maintaining sobriety, refraining from domestic violence, and achieving mental stability. Thus, the superior court did not err in concluding that the State's efforts were active and reasonable, but that they were unsuccessful in preventing the eventual breakup of the H. family.[26]

D. *Did the Superior Court Err in Finding that Continued Custody by A.H. Would Likely Result in Serious Emotional and Physical Damage to the Children?*

■ Next, in order for the court to terminate parental rights for an Indian child, ICWA requires the State to prove that "the continued custody of the child by the parent . . . is likely to result in serious emotional or physical damage to the child." [27] Here, the superior court did find evidence "beyond a reasonable doubt that continued custody by [A.H.] is likely to result in serious emotional and physical damage." The superior court based this finding "on all the evidence presented, including expert testimony; the vulnerability of the children given their age and developmental disabilities; and the longstanding history and complexity of the parents' problems that prevent them from meeting their children'[s] physical and emotional needs."

■ A.H. argues that "after June, 1998 there is virtually nothing in the record to demonstrate that A.H.'s conduct was such that it would pose a threat of serious emotional and physical damage to the children." But, to the contrary, the record suggests that A.H. has not remedied his inability to meet his children's needs, and that they would continue to suffer emotional and physical damage as a result.

For example, testimony at trial indicated that A.H. had not made any real progress in his "independent living skills," including cleaning, shopping, hygiene, and laundry. He also has not maintained steady housing. In June 1999 he was charged with stalking M.H. and assaulting her boyfriend. Moreover, A.H. continues to suffer from paranoid delusions. In June 1999 he wrote a letter to Judge Weeks in which he stated that evil spirits live in the computer network and that there are "treatment teams" that are released from institutions to rape and molest children, and to stalk, rape, and "electroshock" others.

The record indicates that when the H.s visited the children in Sitka after they had been living with their foster mother, the children exhibited severe emotional distress. Eric Wharton, a child protection social worker who was present during the H.s' visits, testified that the girls "were clearly uncomfortable with their relationship" with the H.s. He stated that "there were several times that . . . [A.H.] had tried to place [K.] on [his] lap and she wanted to get off right away." He also stated that when A.H. made a physical move around K., she "flinched," and had "a real visible physical reaction . . . her body moved back . . . and then her head also moved back as if she was trying to avoid something." M.H.'s response to K. was, "no baby doll, Daddy won't hit you."

Mr. Wharton also testified that after the initial December 1997 visit, the girls experienced "a regression." He stated:

There was a lot of progress in—in certain areas, but there was a definite regression back to when they were first placed, and a

---

**26.** The superior court did not make an express finding that the State's efforts had proved unsuccessful, as required by 25 U.S.C. § 1912(d), but the rest of its findings make that point self-evident. Nor does A.H. argue on appeal that the State failed to establish that its efforts were unsuccessful.

**27.** 25 U.S.C. § 1912(e) (1994).

real clingy-ness to [the foster mother]. A lot of tears. The nightmares were real extreme again. And also both of them had gone back to that, it's almost like a comatose reaction to any—any kind of interaction with [the H.s].

After the H.s visited again in April 1998, the girls regressed once more. They had "extreme nightmares," and T. made "blood-curdling screams in the night where [their foster mother] would get up and try and settle the girls down and assure them that things were fine."

Based on the evidence in the record, we conclude that the superior court did not err in finding that the continued custody by A.H. would likely result in serious emotional and physical damage to the children.

E. *Did the Superior Court Err in Finding that Terminating A.H.'s Parental Rights is in the Children's Best Interests?*

 Finally, in order for the court to terminate parental rights, it "shall consider the best interests of the child." [28] And "the best interests of the child, not those of the parents, are paramount." [29] In this case, the superior court found that "it is in the best interests of the children to terminate the rights of [A.H.] but not the rights of [M.H.]." A.H. argues that because there were no reports of physical abuse of the children by A .H., even though "there were forms of neglect of the children," nothing suggests that "the neglect was willful . . . or that [A.H. was] unable to learn and apply new parenting skills."

But A.H. has been physically abusive towards M.H. in the children's presence, and although no one argues that his neglectful behavior was purposeful, he did, in fact, fail to provide basic care for his children. And

as discussed above, the record indicates that A.H. was not able to remedy the harmful conditions that triggered DFYS involvement and his children's CINA status, even if he has not had a direct opportunity to try parenting again.

As the State points out, the present case is distinguishable from this court's recent decision in *A.B. v. State, Department of Health & Social Services*.[30] In that case, this court vacated the superior court's best interests finding because it failed to make clear whether it decided to terminate the mother's rights "for the purposes of freeing [the child] for adoption or other permanent placement." [31] This court concluded that, "[f]or the same reason, it is unclear whether terminating [the mother's] parental rights is in the best interests of [the child]." [32]

We reached that decision in *A.B.* because although the State petitioned to terminate the mother's parental rights, it sought to reunite the child with her father.[33] We further observed that the facts of *A.B.* were "unusual," and that "[w]ith her biological father as her custodian, losing [her rights of inheritance] from her other natural parent would not appear to be in [the child's] best interests." [34] Here, by contrast, the State petitioned to terminate the parental rights of both A.H. and M.H., planning to free the children for adoption. And the superior court ordered the children to remain with their foster mother, limiting M.H.'s visitation rights.

Given the significant needs of the children, their attachment to their foster mother, and A.H.'s failure to improve his behavior, substantial evidence exists to support the superior court's best interests finding.

V. *CONCLUSION*

The superior court did not err in its findings (1) that the children were in need of aid,

28. AS 47.10.088(c); *see also* CINA Rule 18(c)(2)(C) (before the court may terminate parental rights, the Department must prove by a preponderance of the evidence that termination of parental rights is in the best interests of the child).

29. *A.A. v. State, Dep't of Family & Youth Servs.*, 982 P.2d 256, 260 (Alaska 1999).

30. 7 P.3d 946, (Alaska 2000).

31. *Id.* at 953–954.

32. *Id.* at 954.

33. *Id.* at 948.

34. *Id.* at 954–955.

(2) that A.H. failed to remedy the conduct or conditions that placed the children at risk, (3) that DFYS made reasonable but unsuccessful efforts to support the H.s and foster the safe return of the children to the family home, (4) that continued custody by A.H. would likely result in serious emotional and physical damage to the children, and (5) that terminating A.H.'s parental rights is in the children's best interests. We therefore AFFIRM the superior court's decision.