STATE of Alaska, DEPARTMENT OF HEALTH & SOCIAL SERVICES, DIVISION OF FAMILY & YOUTH SERVICES, Appellant,

v.

M.L.L., Appellee.

No. S–10450.

Supreme Court of Alaska.

Dec. 31, 2002.

---

Jan A. Rutherdale, Assistant Attorney General, and Bruce M. Botelho, Attorney General, Juneau, for Appellant.

Robert F. Meachum, Assistant Public Defender, Juneau, and Barbara K. Brink, Public Defender, Anchorage, for Appellee.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, BRYNER, and CARPENETI, Justices.

## OPINION

CARPENETI, Justice.

## I.  INTRODUCTION

The superior court denied a petition to terminate the parental rights of Melanie Lewis [1] (M.L.L.) to her two children, Teresa Hanson and Kelly Hanson.  The State of Alaska, Department of Health and Social Services, Division of Family and Youth Services appeals, claiming that the superior court erred by (1) not considering the emotional harm that would be caused by breaking the bonds between the children and their foster mother and (2) not finding beyond a reasonable doubt that returning the children to their mother would likely result in serious emotional or physical damage.  Because the superior court properly found that there was insufficient evidence to prove beyond a reasonable doubt that the children would be harmed by being returned to Lewis, we affirm that court's decision not to terminate her parental rights.

## II.  FACTS AND PROCEEDINGS

### A.  Facts and Proceedings in the 1999 Termination Trial

This case involves the termination of Lewis's parental rights to her two daughters: Teresa and Kelly.[2]  Lewis and her ex-husband, Arnold Hanson,[3] met in Juneau in 1991, where they were both undergoing treatment with the Juneau Alliance for the Mentally Ill (JAMI).  They had their first daughter, Teresa, in Anchorage in 1995.[4]  Their second daughter, Kelly, was born in October 1996 in Juneau.[5]

In July 1997 the state petitioned for and received temporary custody under the statutes governing children in need of aid (CINA) and the Indian Child Welfare Act (ICWA).[6]  After several unsuccessful attempts to place the children with relatives or native families, Teresa and Kelly were finally placed with a non-native, licensed foster parent.[7]  The foster parent is a special education

---

1.  Pseudonyms are used for all family members in this opinion.

2.  Melanie Lewis married Ron Lewis between the 1999 child custody determination and this case. She is referred to as Melanie Hanson (M.H.) in earlier court documents and M.L.L. in current court documents.

3.  Arnold Hanson's parental rights were terminated in an earlier case, which we affirmed.  *A.H. v.*

*State, Dep't of Health & Soc. Servs.,* 10 P.3d 1156 (Alaska 2000).

4.  *Id.* at 1158.

5.  *Id.* at 1159.

6.  *Id.*

7.  *Id.*

teacher, and has indicated that she wants to adopt the children.[8]

The state then petitioned to terminate the parental rights of both Arnold Hanson and Lewis in 1999. They were adjudicated Children in Need of Aid in both the July 1997 temporary custody determination and the 1999 termination of parental rights decision for a number of reasons.

Teresa and Kelly were found to be children in need of aid under AS 47.10.011(11).[9] Specifically, the superior court found that Lewis was diagnosed with schizo-affective disorder, post-traumatic stress disorder, and mild mental retardation. Lewis's emotional disorders ranged from suicide attempts and ideation to irritable moods and poor tolerance for frustration. These disturbances appeared to be partially caused or exacerbated by Lewis being "overwhelmed by the constant daily pressures of homelessness, her husband's illness, and the routine care of her children."

The children were also found to be children in need of aid under AS 47.10.011(10) because Lewis's habitual use of intoxicants impaired her ability to parent.[10] Between 1997 and 1998, after the children were removed to foster care, Lewis resumed drinking after a period of apparent sobriety. During this period police witnessed her in a state of intoxication, sometimes severe, on at least three occasions. In one incident, a police officer, while responding to a report of a fight at the couple's residence, found beer cans everywhere and Lewis extremely intoxicated.

The children were also found to be CINA under AS 47.10.011(8)(B)(iii) because their repeated exposure to domestic violence placed them at substantial risk of mental injury.[11] On one occasion Hanson almost hit Lewis and Teresa with a backpack while Lewis was holding Teresa. On another occasion a physical altercation between Hanson and Lewis in front of the children left them in a state of extreme distress.

The children were also found to be CINA under AS 47.10.011(9) because of neglect by Hanson and Lewis.[12] The parents failed to feed and clothe their children adequately on several occasions. Additionally, Hanson and Lewis irrationally removed their children from the security of Juneau's Glory Hole shelter and their trailer on separate occasions to spend the night outside because they did not feel safe in those secure places. The couple also failed to provide adequately for their children's health, as both children were constantly sick and Kelly's serious health problems (pneumonia and seizures) were only treated due to the intervention of third parties. Additionally, the children were not

**8.** *Id.*

**9.** AS 47.10.011(11) provides:

Subject to AS 47.10.019, the court may find a child to be a child in need of aid if it finds by a preponderance of the evidence that ... the parent, guardian, or custodian has a mental illness, serious emotional disturbance, or mental deficiency of a nature and duration that places the child at substantial risk of physical harm or mental injury[.]

**10.** AS 47.10.011(10) provides in relevant part:

Subject to AS 47.10.019, the court may find a child to be a child in need of aid if it finds by a preponderance of the evidence that the child has been subjected to [conditions under which] the parent, guardian, or custodian's ability to parent has been substantially impaired by the addictive or habitual use of an intoxicant, and the addictive or habitual use of the intoxicant has resulted in a substantial risk of harm to the child[.]

**11.** AS 47.10.011(8)(B)(iii) provides:

Subject to AS 47.10.019, the court may find a child to be a child in need of aid if it finds by a preponderance of the evidence that the child has been subjected to ... conduct by or conditions created by the parent, guardian, or custodian [which] have ... placed the child at substantial risk of mental injury as a result of ... repeated exposure to conduct by a household member, as defined in AS 18.66.990, against another household member that is a crime under AS 11.41.230(a)(3) or 11.41.250–11.41.270 or an offense under a law or ordinance of another jurisdiction having elements similar to a crime under AS 11.41.230(a)(3) or 11.41.250–11.41.270[.]

**12.** AS 47.10.011(9) provides:

Subject to AS 47.10.019, the court may find a child to be a child in need of aid if it finds by a preponderance of the evidence that ... conduct by or conditions created by the parent, guardian, or custodian have subjected the child or another child in the same household to neglect[.]

bathed regularly and the house lacked toothbrushes, towels, soap, shampoo, and toilet paper for them. The children were assessed as having significant developmental delays in 1997, and one expert said that the neglectful environment put them at high risk of developmental delay.

After Teresa and Kelly were placed with their foster parent, Lewis continued to exhibit problematic behavior for a relatively short period of time. At one point Lewis and Hanson cashed an agency check, meant to provide for the cost of a trip to visit their children, in order to buy alcohol. Additionally, the children suffered from serious regression after visits by Lewis and Hanson in December 1997 and April 1998. By mid–1998 Lewis made some improvements in her ability to care for Teresa and Kelly by ending her relationship with Hanson, stopping her use of alcohol, and beginning a relationship with Ron Lewis, a stable man who does not drink.

In 1999, based on the above facts, the superior court terminated the parental rights of Hanson, a decision that this court affirmed in *A.H. v. State.*[13] In that decision the superior court also found that

> there is clear and convincing evidence that [Melanie Lewis] failed, within a reasonable time, to remedy the conduct and conditions that place the children at substantial risk so that returning the children to the parent would place the children at substantial risk of physical or mental injury.

Nonetheless, the superior court held that the state failed to prove beyond a reasonable doubt, as required for the termination of parental rights under the ICWA,[14] that the children would sustain serious emotional or physical damage if returned to their mother. The court based this finding on Lewis having her substance abuse under control, living with Ron Lewis, and making more intelligent decisions such as avoiding Hanson. The superior court also held a visitation and placement hearing in September 1999 in which it ultimately ordered visitation between the children and their mother under the supervision of the maternal grandparents. The

state did not appeal the superior court's decision.

## B. Facts and Proceedings Between the 1999 Termination Trial and the Current Trial

Between the 1999 termination trial and this proceeding, Lewis made significant progress. The superior court found that she was "clean and sober" for the additional two-year period between the 1999 termination proceeding and the current action. She also maintained a stable marriage with Ron Lewis, her new husband, free of the domestic violence that endangered the children during her marriage to Hanson. Her mental health improved to the point where she was not being actively treated by JAMI and her conservatorship was terminated. Lewis visited her children on four occasions between August 2000 and October 2001 and fulfilled the requirements of her DFYS case plan. Additionally, the social worker's visits, including at least one unannounced visit, revealed a clean apartment with no evidence of alcohol use or domestic violence.

Teresa and Kelly have lived with their current foster mother in Sitka since December 1997. According to Dr. Sheila Clarson, a child psychologist who conducted an assessment of the children's interactions with their mother, grandmother, and foster mother, the children have developed significant attachments to their foster mother during the more than four years in which they have lived with her. Dr. Clarson also testified that severing these bonds between the children and their foster mother would be traumatic and might lead to a number of psychological and developmental problems.

Despite Lewis's substantial progress since the 1999 trial in which the superior court found that there was insufficient evidence to terminate her parental rights, the state filed a second petition to terminate Lewis's parental rights in July 2001. Following trial held on October 29–31, 2001 the superior court again found, based upon the above evidence,

---

**13.** *A.H. v. State,* 10 P.3d 1156 (Alaska 2000).

**14.** 25 U.S.C.A. § 1912(f) (2001).

that it would be in the children's best interest to terminate Lewis's parental rights and allow them to be adopted by their foster mother. But the superior court again "could not find beyond a reasonable doubt that returning the children to the mother would likely result in serious emotional or physical damage." The court therefore denied the state's petition to terminate Lewis's parental rights under the ICWA.[15] The court also continued the children's placement with their foster mother and noted that visitation between the children and both Lewis and her parents had been hampered by the foster mother and must be improved. The state appeals the superior court's decision to deny termination of Lewis's parental rights.

## III. STANDARD OF REVIEW

■ We uphold the superior court's factual findings unless they are clearly erroneous.[16] Factual findings are held to be clearly erroneous if a review of the entire record leaves us "with the definite and firm conviction that a mistake has been made."[17]

■ Whether the superior court's "findings comport with the requirements of ICWA involves a question of law and will be reviewed de novo."[18] Under this standard of review, we will "adopt the rule of law that is most persuasive in light of precedent, reason and policy."[19]

## IV. DISCUSSION

### A. The Superior Court Did Not Err by Not Considering the Likelihood that Granting Custody to Melanie Lewis Would Cause Severe Harm to Teresa and Kelly by Breaking Their Bonds with Their Foster Mother.

■ The state argues that the superior court erred by not considering the potential harm that breaking the bond between the children and their foster mother would cause Teresa and Kelly. The state bases this argument on ICWA § 1912(f),[20] which they claim must be read in conjunction with the Adoption and Safe Families Act (ASFA),[21] to impose a requirement that Lewis remedy her conduct in a timely manner. They claim that this timeliness requirement mandates that courts consider the bonds between the children and the foster mother in determining whether granting custody to the biological parents is likely to result in serious emotional or physical damage to the children. Because the superior court considered the potential harm that the children would suffer from the severing of their bond with their foster mother, we decline to address whether the ICWA requires that these bonds be considered.

The superior court considered the children's attachment to the foster mother in determining that termination of Lewis's parental rights would be in the children's best interests under the preponderance of the evi-

15. Though appellants challenged the applicability of the ICWA at trial and in their points on appeal, they subsequently waived that challenge in their briefs.

16. *A.H.*, 10 P.3d at 1160.

17. *E.A. v. State*, 623 P.2d 1210, 1212 (Alaska 1981).

18. *L.G. v. State, Dep't of Health & Soc. Servs.*, 14 P.3d 946, 950 (Alaska 2000).

19. *Guin v. Ha*, 591 P.2d 1281, 1284 n. 6 (Alaska 1979).

20. 25 U.S.C.A. § 1912(f) (2001) states:

No termination of parental rights may be ordered in such proceeding in the absence of a determination, supported by evidence beyond a

reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child.

21. The state argues that the Adoption and Safe Families Act of 1997, Pub.L. 105–89, § 101, 111 Stat. 2115, 2116 (1998) (codified as amended at 42 U.S.C.A. § 671(a)(15) (Supp.2002)), imposes a requirement that Lewis remedy her conduct in a timely manner and that the reasonableness of the time taken to remedy her conduct is "determined by whether returning the child to the parent at this point 'would place the child at substantial risk of physical or mental injury.'" The state contends that because of Lewis's failure to remedy her conduct in a timely manner the children developed bonds with their foster mother, and that they will suffer emotional harm if these bonds are severed by returning the children to Lewis.

dence burden of proof required by Alaska Child in Need of Aid Rule 18(c)(2)(C).[22] The superior court made an oral finding, in support of the above determination, that "even ignoring the bonding issue the court would find by a preponderance of the evidence that the return of the children to [Lewis] would be more likely than not to result in serious emotional harm to them." While the state is correct that this is the only explicit mention of the bonding issue, this reference demonstrates that the superior court considered the issue. The superior court also relied on the testimony of Dr. Clarson, who testified extensively on the bonding issue.[23] The superior court also impliedly took the relationship between the children and the foster mother into consideration in deciding that "placement with the foster mother is appropriate and that the children are doing well there." We hold that the trial court's findings, in conjunction with its reference to the bonding issue, constitute sufficient consideration of the likelihood that granting Lewis custody would cause emotional harm to Teresa and Kelly.

**B.  The Superior Court Did Not Err in Holding that the Evidence Did Not Prove Beyond a Reasonable Doubt that the Children Would Likely Be Seriously Harmed by Lewis's Continued Custody over Them.**

■ The state argues that returning the children to Lewis's custody will likely be harmful beyond a reasonable doubt because Lewis has failed to remedy some of her damaging conduct, is incapable of remedying other damaging conduct, and that the severing of the children's bond with the foster mother will be emotionally damaging. Put another way, the state contends that it has met its "burden to show beyond a reasonable doubt that failure to terminate parental rights is likely to result in serious emotional or physical harm to the children."[24] While the superior court's findings of fact are sufficient to satisfy the lesser burdens of proof necessary to terminate parental rights under CINA Rule 18 in non-Indian termination cases, the superior court was not clearly erroneous in finding that the higher burden of proof mandated by the ICWA was not met by the state. The trial court did not clearly err in finding that the evidence did not prove beyond a reasonable doubt that Lewis's custody of her children would likely result in serious emotional or physical harm to the children.

Much of the state's argument focuses on past conduct that has been sufficiently remedied so that there is at least a reasonable doubt that the conduct will likely cause serious harm to the children in the future. It appears that Lewis might be among those parents who "are capable of changing and overcoming the problems" that made them unfit parents.[25] Significantly, the superior

22. CINA Rule 18 states in relevant part:
(c) Before the court may terminate parental rights, the Department must prove:
(1) by *clear and convincing* evidence that
(A) the child has been subjected to conduct or conditions described in AS 47.10.011 and
(i) the parent has not remedied the conduct or conditions in the home that place the child at substantial risk of harm; or
(ii) the parent has failed, within a reasonable time, to remedy the conduct or conditions in t he home that place the child in substantial risk so that returning the child to the parent would place the child at substantial risk of physical or mental injury; or
. . . .
(2) by a preponderance of the evidence that
. . . .
(C) termination of parental rights is in the best interests of the child; and
(3) in the case of an Indian child, by evidence beyond a reasonable doubt, including

the testimony of qualified expert witnesses, that continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child.

23. Dr. Clarson's oral testimony dealt extensively with attachment issues. Her report also dealt with the attachment between the children and their foster mother, concluding that removal from the foster family would likely cause severe emotional distress. The report also included a number of relatively favorable evaluations of the interaction between Lewis and her children.

24. *C.J. v. State, Dep't of Health & Soc. Servs.*, 18 P.3d 1214, 1218 (Alaska 2001).

25. *Rita T. v. State*, 623 P.2d 344, 347 (Alaska 1981).

court found that Lewis has sufficiently remedied the alcohol abuse that greatly endangered her children. Though she continued to abuse alcohol for eight months after Teresa and Kelly were taken from her custody, she has been sober for over three years. Likewise, Lewis has done a great deal to remedy the domestic violence that once threatened Teresa and Kelly by separating from Arnold Hanson. Lewis also appears to have responded correctly on two occasions when her eighteen year-old son Gary was drunkenly threatening her and Ron Lewis. On both occasions the police were promptly called and Lewis obtained a restraining order against Gary. Finally, since Lewis's marriage to Ron Lewis, she has remedied many of the unhealthy conditions that posed a danger to Teresa and Kelly. Whereas there would be old food left on the floor or beer cans everywhere when Lewis lived with Hanson, the home she shares with Ron was found to be clean by a state social worker who made a surprise inspection.

The state argues that Lewis is incapable of remedying some of the conduct that poses a threat of harm to her children. Most of these arguments focus on Lewis's continued mental illness, inability to cope with stress, limited intelligence, poor decisionmaking ability, and general lack of basic parenting skills, which the state claims cannot be remedied. This court has previously stated that "while mental illness *alone* cannot form the basis of a termination order, when 'the record links the [parent's] continuing mental illness with his past instances of extreme neglect' there may be a basis for finding that 'improper parental conduct [is] likely to continue.' "[26] It appears to be a close question whether aspects of Lewis's continuing mental illness will cause improper conduct in the future, and therefore prevent her from being able to care safely for her children.

In the 1999 termination proceedings the superior court found that Lewis's mental illnesses, poor judgment, poor tolerance for frustration, and inability to cope with the stress in her life posed a risk of physical and mental injury to her children. In the current termination proceedings, the superior court relied on its factual findings from the 1999 trial. The court also relied on new testimony from Drs. Mander and Clarson. The testimony of both doctors, though partially unfavorable to Lewis, left room for doubt as to whether she and her new husband would be able to safely care for the children. When this testimony is considered along with the facts that Lewis's mental health has improved to the point where she is not being actively treated by JAMI and that her conservatorship has been terminated, we must conclude that it was not clear error for the superior court to find that the state had not proven that the children would likely be physically harmed if they were returned to Lewis's custody.

Dr. Mander found that Lewis suffered from mild mental retardation, that this condition impaired her judgment, and that she possibly suffered from a major, undiagnosed mental illness. He also gave a bleak evaluation of Lewis's ability to make extemporaneous decisions. His final conclusion was that "it is extremely unlikely that [Lewis] could function independently as an appropriate parent ... and she is particularly unable to care for special needs children." Nonetheless, Dr. Mander testified that people with Lewis's diagnosed disorders are treatable and that neither the disorder nor the mild mental retardation necessarily rule anyone out as an effective parent. He also found that she has greatly benefitted from terminating her abusive relationship with Arnold Hanson, entering a supportive relationship with Ron Lewis, and her continued sobriety. On cross-examination Dr. Mander said that it was only "more likely than not that some harm would come to the children if they were in [Lewis's] care, under her ... sole supervision." Dr. Mander also qualified his opinion that the children would likely be harmed if Lewis were caring for them by herself by noting the positive influence of Ron, and he ultimately recommended expanded, structured visitation between the children and Lewis.

---

**26.** *A.H. v. State, Dep't of Health & Soc. Servs.*, 10 P.3d 1156, 1162 (Alaska 2000) (alteration in original) (quoting *J.P.W. v. State*, 921 P.2d 604, 608 (Alaska 1996)).

Dr. Clarson's testimony also raised concerns about Lewis's ability to parent Teresa and Kelly. She found that Lewis had difficulty responding to both children effectively and did not set proper limits for the children. Dr. Clarson also testified that Lewis lacks many basic parenting skills and would need "personal counseling dealing with regulating feeling, regulating emotions and expressing feelings, social skills, training, [and] decision making" as a foundation in order for there to be increased contact between her and her children. Nevertheless, Dr. Clarson ultimately recommended increased visitation between the children and their biological family, saying "not only do I not believe it would be harmful to the children to have contact with their mother and grandparents, I believe that it would be helpful." In light of this testimony, we cannot say that the superior court clearly erred in finding that ICWA's reasonable doubt standard was not met.

The state argues that the significant chance that severing the bonds between the children and their foster mother will cause emotional harm, when combined with the above concerns over Lewis's parenting ability, is sufficient to meet the ICWA's high burden of proof. There was certainly ample testimony from Dr. Clarson supporting a conclusion that the children would be harmed by ending that relationship. Dr. Clarson concluded that after a relationship of almost four years, as of her testimony on October 29, 2001, the children saw their foster parents as their psychological parents. She also expressed concern that the children would "experience serious emotional damage if they were removed from their placement" with their foster mother. Dr. Clarson warned that the ending of this relationship would be extremely distressing to the children and would lead to them acting out and then becoming depressed, detached, and unable to succeed at school or maintain peer relationships for a very long period of time. Nonetheless, Dr. Clarson ultimately recommended

more contact with Lewis and Lewis's parents and family. Likewise, Dr. Mander recommended increased visitation and some unsupervised visitation between the children and their biological family. Additionally, Dr. Mander testified that professionals can be of assistance in overcoming bonding issues. While this testimony did not constitute an endorsement of granting custody to Lewis, it also was not a recommendation that her parental rights be terminated, something that this court has found instructive in similar cases terminating parental rights under ICWA § 1912(f).[27] The testimony supports the superior court's holding that the state did not prove beyond a reasonable doubt that returning the children to Lewis would be likely to cause them severe emotional harm.

The superior court was correct to draw a careful distinction between the preponderance of the evidence and clear and convincing standards of proof used in non-ICWA proceedings and the beyond a reasonable doubt standard of proof demanded by ICWA § 1912(f). We hold that, because of the improvements in Lewis's ability to care for her children and the doubt raised by the expert testimony of Drs. Mander and Clarson, the superior court was not clearly erroneous in finding that the state failed to prove beyond a reasonable doubt that granting Lewis custody of the children would "likely result in serious emotional or physical damage to the [children]."[28]

## V. CONCLUSION

Because the superior court did not err in finding that the state failed to meet the burden of proof demanded by ICWA § 1912(f), we AFFIRM the decision not to terminate Lewis's parental rights.

---

**27.** *See J.A. v. State, Dep't of Family & Youth Servs.*, 50 P.3d 395, 402 (Alaska 2002) ("Both experts recommended that J.A.'s rights to his three children be terminated" and given the experts' high degree of familiarity with the case materials this "was more than sufficient to sup-

port the trial court's conclusion under ICWA that J.A.'s children would likely be seriously harmed if returned to him.").

**28.** 25 U.S.C.A. § 1912(f) (2001).