**A.B., Appellant,**

v.

**STATE of Alaska, DEPARTMENT OF HEALTH & SOCIAL SERVICES, Appellee.**

**No. S–9118.**

Supreme Court of Alaska.

Sept. 8, 2000.

Rehearing Granted Sept. 8, 2000.

---

Kathleen A. Murphy, Assistant Public Defender, Anchorage, and Barbara K. Brink, Public Defender, Anchorage, for Appellant.

Shannon O'Fallon, Assistant Attorney General, Juneau, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before MATTHEWS, Chief Justice, EASTAUGH, FABE, BRYNER, and CARPENETI, Justices.

*OPINION ON REHEARING*

CARPENETI, Justice.

## I. INTRODUCTION

A.B. appeals the superior court's judgment that terminated her parental rights with respect to her child, S.B. At the time of the termination proceedings, the Division of Family and Youth Services (DFYS) was attempting to unite S.B. and her biological father, R.H. In light of these unification efforts, we remand the case for a determination of whether DFYS was attempting to free S.B. for the purposes of adoption or other permanent placement. In all other respects, we affirm the decision of the superior court.

## II. FACTS AND PROCEEDINGS

### A. Facts

A.B. gave birth to S.B. at Swedish Hospital in Seattle in July 1997. A.B., a resident of Ketchikan, had been transferred to Seattle because she went into labor early and Swedish Hospital was better equipped to deal with a premature baby. S.B. was born prematurely. S.B. remained in the hospital in Seattle for almost a month, while A.B., who was eighteen years old at the time, returned to Ketchikan nine days after S.B. was born. Swedish Hospital transferred S.B. directly to Ketchikan General Hospital because of her small size and concerns that A.B. could not meet her infant's needs.

After S.B.'s birth, DFYS received reports from hospital staff members in both Seattle and Ketchikan, who expressed concerns regarding A.B.'s ability to meet S.B.'s basic needs. Staff reported that A.B. appeared unwilling at times to feed S.B. or change her diapers, that they had seen A.B. shaking S.B., and that she handled S.B. roughly. Dr. David Johnson, who was A.B.'s family physician, stated that he did not feel that it was safe to discharge S.B. into A.B.'s care. Dr. Johnson testified that A.B. "was quite impulsive" and lacked common sense. He was most concerned with A.B.'s inconsistency in her handling of S.B., and he thought that A.B. might unintentionally injure S.B. out of some impulsive move caused by frustration.

After S.B. was discharged from the hospital, DFYS took emergency custody of her and placed her in foster care. DFYS then gained temporary custody of S.B. and set up visitation between A.B. and S.B.

DFYS created the first formal case plan about a month later. It was designed to address such concerns as A.B.'s drug and alcohol use, mental health problems, lack of parenting skills, and lack of a stable living environment. Various organizations attempted to assist A.B. in complying with the plan.

By the end of 1997, A.B. had made some progress in the parenting aspects of her case plan. However, she did not begin addressing the mental health and substance abuse aspects of the plan until the early part of 1998. Also in early 1998, A.B. resisted DFYS's efforts to assist her in obtaining a stable living environment. For example, DFYS workers tried to persuade A.B. to fill out applications for low-income housing, but she refused.

In February 1998 A.B. asked for her visitation with S.B. to be stopped for a week because she wanted to spend time with her boyfriend. A.B. later admitted that she largely spent her week off using cocaine and drinking alcohol.

Also in February 1998, A.B. began to address the substance abuse and mental health aspects of her case plan. She made contact with Dr. Keith Youngblood, a psychologist at Gateway Human Services. Dr. Youngblood stated that A.B. had problems with substance use, as well as "a documented history of mood disorder and emotional management problems." In addition, Dr. Youngblood testified that A.B. suffered from some sort of intellectual impairment. While the evidence suggests that Dr. Youngblood did not run formal tests for fetal alcohol syndrome, he testified that A.B.'s record reflects a provisional diagnosis of her suffering from this condition, which is associated with cognitive defects.

Later in February A.B. and Dr. Youngblood met again and outlined a treatment plan. The plan's objectives included A.B.'s abstinence from non-prescribed drugs and development of effective management skills that would keep her mood swings in control. These objectives were to be accomplished through a variety of methods, including weekly counseling sessions. A.B. attended only one of the sessions; she later admitted that there was no real reason why she did not attend more.

In March 1998 A.B. was evaluated for substance abuse at the Ketchikan General Hospital's Recovery Center. She was diagnosed as having polysubstance dependency; it was

recommended that she complete an intensive two-phase care plan. Although A.B. participated in the plan for about two months, she did not complete it.

During May 1998 A.B. was allowed twelve visits with S.B. but made only three of those visits. She visited S.B. about half of her allotted visits in June.

By July 1998 A.B. was unemployed and homeless. She failed to attend the six-month review meeting for her case plan and stopped visiting with S.B. altogether. One of A.B.'s case workers testified that A.B. decided that she was not going to continue with the case plan. Another case worker testified that A.B.'s situation was desperate enough that A.B. was just trying to survive.

In August 1998 A.B. stated that she wanted to relinquish her parental rights and give S.B. up for adoption. She had only one visit with S.B. during that month, and in September she requested only one visit. In October, S.B. was placed in a foster home on Prince of Wales Island and A.B. was allowed one visit with S.B. per month.

On November 30, 1998, having concluded that efforts to unite A.B. and S.B. had failed and that the situation was only getting worse, DFYS filed a petition for the termination of A.B.'s parental rights. From the time that the petition was filed until the termination trial was held, A.B. generally continued not to comply with her case plan.

A.B.'s termination trial was held in April 1999. At the time of the termination proceedings, DFYS was pursuing efforts to unite S.B. and her biological father, R.H.

### B. *Proceedings*

After presiding over a two-day termination trial, Superior Court Judge Thomas M. Jahnke granted DFYS's petition and terminated A.B.'s parental rights. Judge Jahnke ruled that S.B. was a child in need of aid under numerous statutory provisions. He found by clear and convincing evidence that A.B. abandoned S.B. under the first sentence of AS 47.10.013(a), as well as under AS 47.10.013(a)(4) and (8),[1] and that S.B.'s father

---

1. Alaska Statute 47.10.013 provides in relevant part:

had "committed conduct or created conditions that cause the child to be a child in need of aid." Judge Jahnke also ruled that S.B. was, and continued to be, a child in need of aid by reason of neglect, pursuant to AS 47.10.011(9).[2] In addition, Judge Jahnke ruled that S.B. was a child in need of aid under AS 47.10.011(11), in that A.B. "has a 'mental deficiency of a nature and duration that places [S.B.] at substantial risk of physical harm or mental injury.'"

Judge Jahnke also found by clear and convincing evidence that, pursuant to AS 47.10.088(a)(1)(B), A.B. had not remedied the conduct or conditions that placed S.B. at risk. In addition, Judge Jahnke found by a preponderance of the evidence that DFYS had "made reasonable efforts to support the family and foster the safe return of the child to the family home." Finally, Judge Jahnke ruled that terminating A.B.'s parental rights was in S.B.'s best interests.

Following Judge Jahnke's written decision, DFYS submitted proposed "Findings, Conclusions, and Order" that Judge Jahnke signed. A.B. appeals.

## III. DISCUSSION

Alaska Statute 47.10.088(a) allows a court to terminate parental rights "for purposes of freeing a child for adoption or other permanent placement." In order to terminate parental rights under this statute, a court must

first find, by clear and convincing evidence, that: (1) the child is a child in need of aid under AS 47.10.011; and (2) the parent has not remedied the conduct or conditions that place the child at risk.[3] Then, a court must find, by a preponderance of the evidence, that DFYS has made reasonable efforts to support the family and foster the safe return of the child to the family home.[4] In making determinations under this statute, a court must also consider the best interests of the child.[5]

### A. Standard of Review

 In a child in need of aid case, we will sustain the superior court's findings of fact unless they are clearly erroneous.[6] Factual findings are clearly erroneous if a review of the entire record leaves us "with a definite and firm conviction that a mistake has been made."[7] In addition, we apply our independent judgment in reviewing questions of statutory interpretation.[8] Whether the trial court's findings comport with the requirements of the child in need of aid statutes is a question of law that we review de novo.[9]

### B. The Superior Court Did Not Err in Ruling that S.B. Is a Child in Need of Aid.

As noted above, the superior court ruled that S.B. is a child in need of aid under

---

(a) For purposes of this chapter, the court may find abandonment of a child if a parent or guardian has shown a conscious disregard of parental responsibilities toward the child by failing to provide reasonable support, maintain regular contact, or provide normal supervision, considering the child's age and need for care by an adult. Abandonment of a child also includes instances when the parent or guardian, without justifiable cause,

. . . .

(4) failed to participate in a suitable plan or program designed to reunite the parent or guardian with the child;

. . . .

(8) was unwilling to provide care, support, or supervision for the child.

2. Alaska Statute 47.10.011 provides in relevant part:

Subject to AS 47.10.019, the court may find a child to be a child in need of aid if it finds by a preponderance of the evidence that the child has been subjected to any of the following:

. . . .

(9) conduct by or conditions created by the parent, guardian, or custodian have subjected the child or another child in the same household to neglect[.]

3. See AS 47.10.088(a)(1)(B).

4. See AS 47.10.088(a)(2); AS 47.10.086.

5. See AS 47.10.088(c).

6. See R.J.M. v. State, Dep't of Health and Soc. Servs., 973 P.2d 79, 84 (Alaska 1999) (citation omitted).

7. Id. (citation omitted).

8. See id.

9. See id.

numerous statutory provisions.[10] The record supports the superior court's determination that S.B. is a child in need of aid pursuant to AS 47.10.011(1) [11] because A.B. abandoned S.B. pursuant to AS 47.10.013(a)(4),[12] and because S.B.'s biological father has "committed conduct or created conditions" that caused S.B. to be a child in need of aid. Since we affirm this determination, we need not address the other grounds on which the superior court ruled that S.B. is a child in need of aid.

1. *The superior court did not err in ruling that A.B. failed to participate in a suitable reunification plan without justifiable cause.*

Alaska Statute 47.10.013(a)(4) states that abandonment of a child includes instances in which the parent, without justifiable cause, "failed to participate in a suitable plan or program designed to reunite the parent ... with the child." The record supports the superior court's determination that A.B. abandoned S.B. under the terms of this statute.

a. *The superior court did not err in ruling that A.B. failed to participate in a suitable reunification plan.*

■ We have not yet had occasion to decide what "failed to participate" means within the context of AS 47.10.013(a)(4). While this statutory provision does not necessarily require a parent to follow his or her reunification plan to the letter, it does require more than minimal participation.

10. *See supra* Part II.B.

11. Alaska Statute 47.10.011 provides, in relevant part:
Subject to AS 47.10.019, the court may find a child to be a child in need of aid if it finds by a preponderance of the evidence that the child has been subjected to any of the following:
(1) a parent or guardian has abandoned the child as described in AS 47.10.013, and the other parent is absent or has committed conduct or created conditions that cause the child to be a child in need of aid under this chapter[.]
Alaska Statute 47.10.019 provides:
Notwithstanding other provisions of this chapter, the court may not find a minor to be a

A.B. made some progress in following her reunification plan during 1997. However, in February 1998 she asked for time off from visitation so that she could spend more time with her boyfriend. During the time off, A.B. consumed cocaine and drank alcohol. This interlude began a period of steadily downward performance by A.B., at the culmination of which she essentially dropped out of the reunification plan.

By July 1998 A.B. stopped visiting with S.B. altogether. She also failed to attend the six-month review meeting for her case plan and articulated her decision that she was not going to follow the plan. In August 1998 A.B. stated that she wanted to relinquish her parental rights and give up S.B. for adoption.

While A.B. did have token visitation with S.B. during the latter part of 1998, the record suggests that she failed to participate in the other aspects of her case plan from July 1998 to March 1999. By failing to even minimally participate in her case plan for over six months, A.B.'s conduct falls within the definition of "abandonment" stated in AS 47.10.013(a)(4). We accordingly hold that the superior court did not err in ruling that A.B. failed to participate in a suitable reunification plan under this statute.

b. *The superior court did not err in ruling that A.B.'s failure to participate in her reunification plan was without justifiable cause.*

■ Alaska Statute 47.10.013(a)(4) provides that a failure to participate in a suitable reunification plan constitutes "abandonment" if the failure was without justifiable cause.

child in need of aid under this chapter solely on the basis that the child's family is poor, lacks adequate housing, or exhibits a lifestyle that is different from the generally accepted lifestyle standard of the community where the family lives. However, this section may not be construed to prevent a court from finding that a child is in need of aid if the child has been subjected to conduct or conditions described in AS 47.10.011—47.10.015.

12. Alaska Statute 47.10.013(a)(4) provides that "abandonment" includes instances in which a parent, without justifiable cause, "failed to participate in a suitable plan or program designed to reunite the parent ... with the child."

On appeal, A.B. argues that her failure to comply with her case plan was not fully voluntary because the failure was caused by her poverty and her homelessness.

However, A.B.'s assertions are not borne out by the record. For example, one aspect of A.B.'s case plan was to apply for low-income housing. A.B. resisted DFYS's repeated attempts to assist her with this aspect of the plan. DFYS workers attempted to assist A.B. in filling out applications for low-income housing, but A.B. would not fill out the applications. Another aspect of A.B.'s case plan was to obtain mental health treatment through weekly counseling sessions, but she attended only one session. She offers no evidence that these failures on her part were related to her poverty or were in any way justified.

Although A.B. was extremely poor in the summer of 1998, the record suggests that DFYS and other organizations gave A.B. ample opportunities to maintain a stable lifestyle. As such, we cannot say that the superior court erred in ruling that A.B.'s failure to participate in the reunification plan was without justifiable cause. We therefore affirm the superior court's conclusion that A.B. abandoned S.B. within the meaning of AS 47.10.013(a)(4).

2. *The superior court did not err in ruling that S.B.'s father committed conduct or created conditions that caused S.B. to be a child in need of aid.*

In order for a court to find that a child is a child in need of aid under AS 47.10.011(1), a court must find not only that the child has been abandoned under AS 47.10.013, but also that "the other parent is absent or has committed conduct or created conditions that cause the child to be a child in need of aid." [13]

Here, the superior court determined that S.B.'s biological father, R.H., had committed such conduct or created such conditions.

■ On appeal, A.B. does not challenge this determination. Accordingly, we need not consider this matter further.[14] We therefore affirm the superior court's ruling that R.H. committed conduct or created conditions that cause S.B. to be a child in need of aid.

We accordingly affirm the superior court's ruling that S.B. is a child in need of aid pursuant to AS 47.10.011.

C. *The Superior Court Did Not Err in Ruling that A.B. Has Failed to Remedy the Conduct or Conditions that Place S.B. at Risk.*

In order to terminate parental rights under AS 47.10.088, a court must not only find that a child is a child in need of aid; the court must also find, by clear and convincing evidence, that the parent

(i) has not remedied the conduct or conditions in the home that place the child at substantial risk of harm; or

(ii) has failed, within a reasonable time, to remedy the conduct or conditions in the home that place the child in substantial risk so that returning the child to the parent would place the child at substantial risk of physical or mental injury[.] [15]

Here, the superior court found by clear and convincing evidence that A.B. failed to remedy the situation under either prong of this statutory provision.

On appeal, A.B. did not argue in her brief that she had remedied the conduct or condi-

---

13. AS 47.10.011(1).

14. *See Adamson v. University of Alaska,* 819 P.2d 886, 889 n. 3 (Alaska 1991) (citations omitted). Although it is unnecessary to the resolution of this appeal, we note that the superior court's findings provide more than adequate support for its determination that R.H. committed conduct or created conditions that cause S.B. to be a child in need of aid. For example, the superior court found that R.H. fled Ketchikan during A.B.'s pregnancy to avoid contact with her, and that he did so with the intent of letting A.B. fail

as a parent so that he could then step in and demand custody of S.B. Because R.H. left S.B. in the custody of someone he believed to be a highly inadequate parent, the record supports the superior court's determination that R.H.'s conduct placed S.B. at a substantial risk of suffering substantial physical harm, and that R.H. thereby caused S.B. to be a child in need of aid under AS 47.10.011(6).

15. AS 47.10.088(a)(1)(B).

tions that place S.B. at risk.[16] Accordingly, we need not consider this issue.[17] We therefore affirm the superior court's ruling that A.B. has failed to remedy the conduct or conditions that place S.B. at substantial risk.

### D. The Superior Court Did Not Err in Ruling that DFYS Made Reasonable Efforts to Support the Family and Foster the Safe Return of S.B. to A.B.'s Home.

■ In addition to the requirements for terminating parental rights that are discussed above,[18] AS 47.10.088 requires DFYS to show "by preponderance of the evidence that the department has complied with the provisions of AS 47.10.086 concerning reasonable efforts" to provide family support services designed to prevent out-of-home placement of the child or to return the child to the family home.[19]

The superior court found, by a preponderance of the evidence, that DFYS made "reasonable efforts" as required by AS 47.10.088. It stated that the failure of those efforts is primarily the result of A.B.'s refusal to take advantage of the services that were offered to her. The record supports the superior court's ruling.

While A.B. suggests that DFYS's reunification plan was fatally flawed because it did not adequately address her housing needs, the record establishes that one of the concerns that A.B.'s case plan was designed to address was her lack of a stable living envi-

ronment. Case workers attempted to help A.B. fill out applications for low-income housing, but A.B. would not fill out the applications. The record reflects that A.B. was offered help in addressing her housing needs, but did not take advantage of that help.

DFYS took numerous other steps in its attempt to reunite A.B. and S.B. It created a case plan and offered A.B. specific services designed to address the concerns referred to in the plan. A.B. did not, however, make full use of these services and, in the summer of 1998, she decided that she would no longer follow the case plan.

Given DFYS's efforts in creating the case plan and offering A.B. services that would help her achieve the objectives of that plan, we affirm the superior court's ruling on the reasonable efforts issue.

### E. In Light of DFYS's Attempts To Unite S.B. and Her Biological Father, the Record Does Not Support the Superior Court's Decision to Terminate A.B.'s Parental Rights.

Although we affirm the superior court's rulings in all other respects,[20] we must nevertheless remand this case for further proceedings. In light of DFYS's attempts to unite S.B. and her biological father, R.H., it is unclear whether the superior court terminated A.B.'s parental rights "for the purposes of freeing [S.B.] for adoption or other perma-

---

16. A.B. does discuss the failure-to-remedy provision in her brief, but she does so in the context of arguing that termination of her parental rights was not in S.B.'s best interests. A.B. does not argue that she has remedied the conduct or conditions that place S.B. at substantial risk.

17. See Adamson, 819 P.2d at 889 n. 3 (citations omitted).

18. See supra Parts III.B–C.

19. AS 47.10.088(a)(2). Alaska Statute 47.10.086 is entitled "REASONABLE EFFORTS." It provides, in relevant part:

(a) [T]he department shall make timely, reasonable efforts to provide family support services to the child and to the parents or guardian of the child that are designed to prevent out-of-home placement of the child or to en-

able the safe return of the child to the family home, when appropriate, if the child is in an out-of-home placement. The department's duty to make reasonable efforts under this subsection includes the duty to

(1) identify family support services that will assist the parent or guardian in remedying the conduct or conditions in the home that made the child a child in need of aid;

(2) actively offer the parent or guardian, and refer the parent or guardian to, the services identified under (1) of this subsection; the department shall refer the parent or guardian to community-based family support services whenever community-based services are available and desired by the parent or guardian; and

(3) document the department's actions that are taken under (1) and (2) of this subsection.

20. See supra Parts III.B–D.

nent placement." [21] For the same reason, it is unclear whether terminating A.B.'s parental rights is in the best interests of S.B. We accordingly remand the case for further determinations regarding these matters.

1. *Alaska Statute 47.10.088(a) allows for the termination of parental rights only for the purposes of freeing a child for adoption or other permanent placement.*

Alaska Statute 47.10.088(a) provides that a court may terminate parental rights "for the purposes of freeing a child for adoption or other permanent placement." Here, it is unclear whether the superior court terminated A.B.'s parental rights for either of these purposes. While the superior court noted that S.B. has an interest in having a stable, permanent family arrangement, at the time of the termination proceedings DFYS was attempting to unite S.B. and her biological father, R.H.[22]

At the time the parties submitted their appellate briefs, DFYS noted that S.B. had been placed in her father's care, but stated that DFYS still had custody over her. While the record indicates that DFYS had supervisory custody until January 1, 2000, the record does not indicate what happened after that date.

In light of these facts, it is unclear whether DFYS was attempting to terminate A.B.'s parental rights for the purpose of freeing S.B. "for adoption or other permanent placement." [23] It does not appear that S.B. was going to be placed with adoptive parents after the termination proceedings.[24] We therefore remand this case for a finding as to whether termination of A.B.'s parental rights is for the purpose of freeing S.B. for adoption or other permanent placement. If the superior court finds on remand that A.B.'s parental rights would not be terminated for the purpose of freeing S.B. "for adoption or other permanent placement," the court should decline to terminate A.B.'s parental rights.

2. *The record is unclear whether terminating A.B.'s parental rights is in the best interests of S.B.*

Alaska Statute 47.10.088(c) provides that "[i]n a proceeding under this chapter involving termination of [parental rights], the court shall consider the best interests of the child." We have stated that "in a termination trial, the best interests of the child, not those of the parents, are paramount." [25]

Here, the superior court determined that terminating A.B.'s parental rights is in S.B.'s best interests. In doing so, the superior court suggested that terminating A.B.'s parental rights would help give S.B. "the best opportunity for life in a stable and nurturing home." In light of DFYS's efforts to unite S.B. and R.H., however, we are not persuaded that the superior court's best interests determination is supported under the unusual facts of this case.[26] As A.B. argues, termination of her parental rights has, in effect, left S.B. "half-orphaned." If R.H. turns out to be a satisfactory parent for S.B., it is difficult for us to see how severing all ties

21. Alaska Statute 47.10.088(a).

22. Judge Jahnke suggested that in light of these reunification efforts, DFYS's pursuit of termination proceedings against A.B. "struck [him] as curious." He also questioned whether the state had an interest in terminating A.B.'s parental rights, and suggested that DFYS should be more concerned with the father. DFYS responded by stating that it thought it was best to go forward with the termination proceedings regarding A.B., and that it would attempt to terminate R.H.'s parental rights if it had to do so.

23. AS 47.10.088(a).

24. Placement with a non-terminated parent could be an "other permanent placement" under AS 47.10.088(a), and, under AS 47.10.088(h), terminating the non-custodial parent's rights would not affect the rights of the custodial parent. But the termination must be made "for purposes of freeing" a child for such permanent placement. If the state argues on remand that this is such a case, the court should make findings on this point.

25. *A.A. v. State, Dep't of Family & Youth Servs.,* 982 P.2d 256, 260 (Alaska 1999) (citing *R.F. v. S.S.,* 928 P.2d 1194, 1197 (Alaska 1996)).

26. Judge Jahnke's observation that DFYS's pursuit of termination against A.B. while seeking to unite S.B. with her biological father was "curious," *see supra* note 21, suggests the trial court's unease with this aspect of the case.

with A.B. is in S.B.'s best interests.[27] If A.B.'s parental rights are terminated, S.B. would lose her rights of inheritance from A.B. and her right to support from her biological mother. With her biological father as her custodian, losing these important rights for her other natural parent would not appear to be in S.B.'s best interests.

In light of DFYS's attempt to unite S.B. and her biological father, the superior court on remand should first determine the status of that effort, and then determine whether the termination of A.B.'s parental rights is for the purpose of facilitating S.B.'s adoption or other permanent placement. If the court determines that terminating A.B.'s parental rights is for that purpose, the court should then determine whether, in light of its other findings, such a termination is in S.B.'s best interests.

## IV. CONCLUSION

The record supports the superior court's determinations that S.B. is a child in need of aid, that A.B. failed to remedy the conduct or conditions that place S.B. at risk, and that DFYS made reasonable efforts to foster the safe return of S.B. to A.B.'s home. However, because DFYS was seeking to unite S.B. and her biological father at the time of the termination proceedings, we REMAND this case to the superior court to determine: (1) the status of DFYS's efforts to unite S.B. and R.H.; (2) the purpose of terminating A.B.'s parental rights; and (3) if necessary, the best interests of S.B.

27. The situation would be different if DFYS were attempting to place S.B. into a permanent adoptive home. On the basis of the record, a strong case can be made for concluding that such a placement would be in S.B.'s best interests. Here, however, it appears that S.B. was not going to be placed in a permanent adoptive home. Rather, DFYS was seeking to place S.B. with her father, at least until DFYS determines that the father is also not an adequate parent.