BRYNNA B., Appellant,

v.

STATE of Alaska, DEPARTMENT OF HEALTH & SOCIAL SERVICES, Division of Family & Youth Services, Appellee.

No. S–11070.

Supreme Court of Alaska.

March 19, 2004.

Rehearing Denied May 4, 2004.

B.B., pro se.

Michael G. Hotchkin, Assistant Attorney General, Anchorage, and Gregg D. Renkes, Attorney General, Juneau, for Appellee.

Before: BRYNER, Chief Justice, MATTHEWS, EASTAUGH, FABE, and CARPENETI, Justices.

*OPINION*

CARPENETI, Justice.

## I. INTRODUCTION

Appellant Brynna B.[1] unsuccessfully attempted to gain foster custody of her niece, Jaclyn, a child in need of aid who had been removed from the custody of her mother, Arlene B., Brynna's twin sister. Brynna claims that the superior court misinterpreted AS 47.14.100(e)'s "relative placement preference" provision, and thus erroneously failed to reverse the state's refusal to place Jaclyn in her care. Because it was not clearly erroneous to find that Brynna would likely ignore instructions not to place Jaclyn with Arlene, and because under the facts of this case this constitutes clear and convincing evidence that placing Jaclyn with Brynna would result in injury to the child, we conclude that the superior court properly upheld the state's refusal to place Jaclyn in Brynna's custody.

## II. FACTS AND PROCEEDINGS

The State of Alaska, Department of Health and Social Services, Division of Family and Youth Services (DFYS)[2] removed six-week-old Jaclyn from Arlene's custody in May 2002. According to DFYS, medical providers had reported that, during her pregnancy with Jaclyn, Arlene repeatedly stated that "I hope this baby is dead." Following Jaclyn's birth, DFYS received reports from a doctor that Arlene believed that Jaclyn had colic and had stopped feeding her. The doctor also reported that Arlene did not understand how to change the baby's diapers, despite repeated instructions, and was "scrubbing off the baby's dead skin" instead of using lotion.

Later, Arlene was reported to be "grossly overfeeding" Jaclyn, and said that "[t]he only way I can shut her the hell up is to feed her." Arlene refused to cooperate with DFYS staff, requesting that they visit in the middle of the night because she slept through the day and claiming that "[y]ou people are just out to get me." Arlene was diagnosed with depression, but refused to seek professional counseling or take prescribed medications.

Based on the record above, testimony presented by DFYS in a hearing on the matter, and "the behavior of [Arlene] in these proceedings," the superior court upheld the decision to remove Jaclyn from Arlene's custody. The court found probable cause to believe that Jaclyn was a child in need of aid under AS 47.10.011(1) and (11).[3] The court also found that DFYS had made reasonable efforts under the circumstances to prevent Jaclyn's removal from Arlene's home. The court explained:

> continued placement in the home would be contrary to the welfare of the child because of the risk posed to the vulnerable infant by the mother's inability to perceive danger to the child, her inability to retain information given to her on care for the child, her inability or refusal to follow directions given to her on care for the child, her anger management problems that pose a risk to the child, and her refusal to accept medication or counseling for her diagnosis of Severe Major Depression which could also affect her ability to adequately care [for] and protect her child.

The court granted DFYS custody over Jaclyn, who was placed in a foster home.

The superior court later upheld DFYS's denial of a request by Lottie O., Jaclyn's maternal grandmother, to place the child in her home. The denial was based on concerns

1. Pseudonyms have been used to protect the identity of the family members.

2. This office is now known as the Office of Children's Services (OCS), but we refer to it by the official name used in the proceedings below.

3. Alaska Statute 47.10.011(1) and (11) provide that the court may find a child to be in need of aid if it finds that:

(1) a parent or guardian has abandoned the child as described in AS 47.10.013, and the other parent is absent or has committed conduct or created conditions that cause the child to be a child in need of aid under this chapter;

. . . .

(11) the parent, guardian, or custodian has a mental illness, serious emotional disturbance, or mental deficiency of a nature and duration that places the child at substantial risk of physical harm or mental injury[.]

about the proximity of Lottie's residence to Arlene's residence, concerns that Lottie would return the child to Arlene's care and custody without the department's consent, and concerns about the nature of Lottie's motivation to cooperate with the department's case plan. DFYS instead placed Jaclyn in Hawaii with her father, pursuant to a "Care and Safety Plan" containing detailed restrictions on the contact that the father could allow Arlene to have with the child. When Jaclyn's father subsequently ignored the plan, and allowed Arlene unsupervised care and control of Jaclyn, Jaclyn was removed from her father's custody, and returned to her previous foster home in Alaska.[4]

Arlene's twin sister Brynna then requested placement of Jaclyn. DFYS denied her request, based on concerns that Brynna and Arlene were closely aligned, concerns that if Jaclyn were placed with Brynna, the child might once again be subjected to improper and dangerous contacts with Arlene, and concerns that Brynna would not cooperate with DFYS in obtaining services that Jaclyn required.

The superior court held a hearing to review DFYS's refusal to grant Brynna's placement request. At the hearing, witnesses described how Brynna had refused to allow social workers into Arlene's home to remove Jaclyn, had threatened the staff at Jaclyn's pediatrician's office, and had been forcibly removed from DFYS premises and threatened with arrest, after antagonizing social workers during a supervised visit between

Arlene and Jaclyn. Following the hearing, the court concluded that it had serious doubts about "[Brynna's] ability to care for the child vis-a-vis protection from ... her sister, and work with the department." The court therefore upheld DFYS's placement decision. Brynna appeals.

## III. STANDARD OF REVIEW

In a child in need of aid case, we will sustain a superior court's findings of fact unless they are clearly erroneous.[5] Findings of fact are clearly erroneous if a review of the entire record in the light most favorable to the party prevailing below[6] leaves us "with a definite and firm conviction that a mistake has been made."[7] Thus, we will ordinarily not overturn a superior court's findings based on conflicting evidence.[8] The issue of whether a trial court's findings satisfy the relevant statutory requirements is a question of law that we review *de novo*.[9] In interpreting child in need of aid statutes and other laws, we apply our independent judgment, adopting the rule of law that is most persuasive in light of precedent, reason, and policy.[10]

A DFYS placement decision is ordinarily reviewed by the superior court under the abuse of discretion standard.[11] In this case however, the normal standards of review are superseded by statute. Alaska Statute 47.14.100(e) provides:

A child may not be placed in a foster home or in the care of an agency or institution providing care for children if a relative by

---

**4.** Jaclyn has apparently been living with a paternal uncle since then. As DFYS notes, this case is thus arguably moot, since Jaclyn has already been placed in the foster care of a blood relative, albeit one other than Brynna. However, the uncle's family has informed DFYS that "they will no longer be able to provide care for the child due to recently diagnosed physical problems with the aunt," and DFYS is currently investigating potential alternative placements for Jaclyn. The disputed issue in this appeal is thus capable of repetition, and we accordingly reach its merits. We also do so for the independent reason that a consistent theme of Brynna's *pro se* appeal is that DFYS erred in not placing the child with her from the beginning.

**5.** *A.B. v. State, Dep't of Health and Soc. Servs.*, 7 P.3d 946, 950 (Alaska 2000).

**6.** *Martin N. v. State, Dep't of Health and Soc. Servs.*, 79 P.3d 50, 53 (Alaska 2003).

**7.** *A.B.*, 7 P.3d at 950 (quoting *R.J.M. v. State, Dep't of Health and Soc. Servs.*, 973 P.2d 79, 84 (Alaska 1999)).

**8.** *Martin N.*, 79 P.3d at 53.

**9.** *Id.*

**10.** *S.S.M. v. State, Dep't of Health and Soc. Servs.*, 3 P.3d 342, 344 (Alaska 2000).

**11.** *Matter of D.P.*, 861 P.2d 1166, 1167 (Alaska 1993) (internal citations omitted).

blood or marriage requests placement of the child in the relative's home. However, the department may retain custody of the child and provide for its placement in the same manner as for other children if the department

(1) makes a determination, supported by clear and convincing evidence, that placement of the child with the relative will result in physical or mental injury; ... this determination may be appealed to the superior court to hear the matter de novo.

Thus, DFYS had the burden of proving by clear and convincing evidence [12] that placement with Brynna would be physically or mentally detrimental to Jaclyn.[13] The superior court reviews such a determination *de novo*.[14] We use our independent judgment in reviewing the superior court's decision.[15]

## IV. DISCUSSION

### The Superior Court Properly Upheld the Department's Refusal To Place Jaclyn in Brynna's Custody.

■ Brynna claims that, as Jaclyn's blood relative, she is entitled to custody of Jaclyn under AS 47.14.100(e).[16] DFYS and the superior court disagreed.[17] The superior court upheld DFYS's denial of Brynna's placement request based on its determination that Brynna was unwilling to implement DFYS's case plan for Jaclyn. The court found Brynna unable to work with DFYS staff. As it explained, "[s]he doesn't trust them. She thinks they're racist. She doesn't have any belief in the legitimacy of what they're doing.

She feels very wronged on behalf of her sister." The court conceded that Brynna is "utterly entitled to those beliefs," and that "there is no reason why one can't fundamentally believe that the department is doing the wrong thing and nevertheless work with the department." But the court noted that "this hasn't been the history of this case to date," and "at bottom, the track record with respect to [Brynna's] dealings with the key DFYS people are that she can't work with them." Accordingly, the court upheld DFYS's denial of placement.

Brynna essentially argues on appeal that DFYS did not present adequate evidence that she would fail to abide by the provisions of Jaclyn's case plan.[18] Brynna has presented some evidence that she would cooperate with DFYS and follow Jaclyn's case plan, but DFYS presented significant evidence to the contrary.

Social worker Sharon Chambers testified that when she attempted to remove Jaclyn from Arlene's custody, Arlene, Lottie, and Brynna were "belligerent," "refused to allow the social workers ... into the home," slammed the door in her face, would only cooperate with the state trooper who was present, and were threatened with arrest for their refusal to cooperate. On the same day, Arlene and Brynna went to the office of Dr. Karen Impson, Jaclyn's pediatrician. Dr. Impson testified that the sisters' behavior was so threatening that the police were called to escort them from the building. The office manager then escorted the staff from

---

**12.** "Clear and convincing evidence has been characterized as evidence that is greater than a preponderance, but less than proof beyond a reasonable doubt." *Buster v. Gale*, 866 P.2d 837, 844 (Alaska 1994).

**13.** AS 47.14.100(e)(1).

**14.** *Id.*

**15.** *A.B. v. State, Dep't of Health and Soc. Servs.*, 7 P.3d 946, 950 (Alaska 2000).

**16.** Brynna claims that she "had a legal right to have [Jaclyn] placed in [her] home" under the statute. Just as we construe adoption statutes to promote the best interests of adopted children, *In re Adoption of Keith M.W.*, 79 P.3d 623, 637 (Alaska 2003) (Matthews, J., concurring), we

similarly construe a foster placement statute in the best interests of the foster child, not the potential foster parent. It is the child's legal right to be placed with a relative, where such placement is not clearly injurious. It is not the relative's legal right to have the child placed with her.

**17.** In its ruling, the superior court expressed uncertainty over whether to review DFYS's decision for clear error, or to require DFYS to show clear and convincing evidence. The court accordingly ruled under both standards.

**18.** Because Brynna appears before this court *pro se* we hold allegations made in her brief to a less stringent standard than allegations made by a lawyer. *See Prentzel v. State, Dep't of Pub. Safety*, 53 P.3d 587, 593 (Alaska 2002).

the building by a separate exit, and instructed them to drive in separate directions and not to drive home in their normal pattern. The office subsequently obtained a restraining order against Brynna and Arlene.

DFYS also presented testimony regarding incidents that occurred while Jaclyn was in foster care. On two occasions Brynna accompanied Arlene on supervised visits with Jaclyn at the DFYS office. Brynna and Arlene accused DFYS of abusing Jaclyn, which led to escalating shouting and chaos in the office. DFYS social worker Lori D'Amico testified that the sisters played loud music during their visits with Jaclyn and that Jaclyn would often be screaming after the visits. D'Amico testified that during one of the visits she had to call the police in order to get Brynna and Arlene off of the premises. According to D'Amico, when the sisters were asked to end the visit and return Jaclyn, they "huddled in a corner ... and absolutely refused to give her back to us." Brynna then had to be forcibly removed from the premises by the police. After the visit, Jaclyn was "crying so hard that [she had] a hard time catching [her] breath" for twenty minutes after Arlene and Brynna left.

Following the chaotic first visit, DFYS told Arlene that she could visit with Jaclyn, but that she could not bring any family members with her. Arlene entered the building alone, but Brynna was waiting outside in the car and at some point Arlene motioned for Brynna to bring a camera into the building. Brynna brought the camera in and gave it to Arlene. When D'Amico asked Brynna to leave, she put her foot inside the door. D'Amico "asked her several times to remove her leg and leave the building," and then threatened to call the police again, at which point Brynna "[said] she didn't want to be arrested and she left."

■ In light of this evidence, the superior court's findings are not clearly erroneous. The critical question for us, then, is whether the unlikelihood that Brynna will cooperate with DFYS or follow Jaclyn's case plan constitutes clear and convincing evidence that

Jaclyn would be mentally or physically injured if placed in Brynna's custody.

Brynna claims that "the state provide[d] no evidence to even suggest" and the superior court "never found clear and convincing evidence" that placing Jaclyn in her custody would cause physical or mental injury to Jaclyn. She claims that both DFYS and the court based their conclusions on assumptions. It is true that DFYS presented no direct evidence that Brynna's potential failure to abide by Jaclyn's case plan would injure the child. Instead, D'Amico explained to Brynna that "you're aligned with your sister, and ... if she was unsafe with her child, we do not think you would be protective. We cannot place with relatives unless we feel they are protective of the children. And that is the bottom line." Inherent in the court's decision is its agreement with DFYS that Brynna's failure to follow Jaclyn's case plan would in fact expose the child to injury. As the court explained to Arlene, "the department had clear and convincing evidence to demonstrate that that placement was not going to work to protect your baby from you."

The issue then is whether DFYS and the superior court properly inferred harm to Jaclyn based only on Brynna's likely non-compliance with Jaclyn's case plan. We have not previously considered whether a trial court may disregard the relative placement preference law based on a foster parent's likely non-compliance with a DFYS case plan.[19] But the state obviously may base child placement and foster care decisions on the likelihood of future harm to a child. An unwillingness to cooperate with DFYS or to abide by its case plans is generally a strong indicator of future harm. As one DFYS social worker explained, when a child is placed with someone who ignores placement restrictions or rules, there is a danger that the child will not receive "the appropriate services or treatment that are needed to ensure the safety of the child."

A comparison with the legal standard for terminating parental rights is instructive. A parent's unwillingness to abide by a case plan may be considered part of the clear and

---

**19.** This is possibly what Brynna means when she argues that the superior court did not "have the power to create new laws or to add to old ones."

convincing evidence of harm to a child that the state must show in order to terminate the parent's rights and responsibilities regarding that child.[20] Since denying child placement with a relative requires the same "clear and convincing evidence" as the termination of parental rights, there is no logical reason not to consider unwillingness to abide by a case plan in foster placement decisions as well. The superior court correctly held that Brynna's likely refusal or inability to keep her sister Arlene away from Jaclyn, in contravention of DFYS instructions, constituted clear and convincing evidence that Jaclyn would be injured by placement with Brynna.[21]

## V. CONCLUSION

The superior court did not commit clear error in determining that Brynna would fail to keep Jaclyn separated from Arlene as required by Jaclyn's case plan. This likely failure to abide by the case plan constitutes clear and convincing evidence of probable future physical or emotional harm to Jaclyn. The superior court therefore justifiably upheld the state's denial of Brynna's request to place Jaclyn in her custody, and we AFFIRM the decision of the superior court.

---

20. See, e.g., M.W. v. State, Dep't of Health and Soc. Servs., 20 P.3d 1141, 1146 (Alaska 2001) (in determining whether DFYS made "reasonable efforts" to prevent out-of-home placement of child in need of aid, superior court may consider parent's unwillingness to "engage in his case plan") (citing AS 47.10.088(a)(1)(B)(ii)). Other jurisdictions have found similarly. See, e.g., In re B.I.F., 592 S.E.2d 441, 2003 WL 22952568 (Ga. App.2003) (clear and convincing evidence of likelihood of serious harm to child included mother's failure to complete her "reunification plan"); In re D.S.A., 113 S.W.3d 567 (Tex.App.2003) (evidence supporting termination of father's parental rights included his failure to meet requirements of "family service plan"); B.D.S. v. Calhoun County Dep't of Human Res., — So.2d —, 2003 WL 21770777 (Ala.Civ.App.2003) (in terminating parental rights over child not in parent's custody, courts may consider the "[l]ack of effort by the parent to adjust his or her circumstances to meet the needs of the child in accordance with agreements reached ... with local departments of human resources").

21. DFYS also argues that Brynna's unwillingness to cooperate with the department is shown by her "campaign" against it, which included requesting internal agency investigations; writing letters to, filing complaints with, and attempting to subpoena numerous state and federal officials; protesting outside DFYS offices; and soliciting plaintiffs for a class action lawsuit against DFYS. Were this "campaign" the basis for the superior court's ruling, Brynna's assertion that the state is punishing her exercise of her First Amendment rights might have merit. However, the superior court itself expressed skepticism that Brynna's "campaign" could be a factor in determining that Brynna would not cooperate. There is no indication in the record that the superior court's decision was based on the "campaign." Rather, the court stressed that its decision was based on Brynna's pattern of behavior in dealing with DFYS concerning Jaclyn.