NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite a memorandum decision in a brief or at oral argument should review Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| PATIENCE P., | ) | |
| | ) | Supreme Court No. S-14437 |
| Appellant, | ) | |
| | ) | Superior Court No. 3AN-10-00238 CN |
| v. | ) | |
| | ) | MEMORANDUM OPINION |
| STATE OF ALASKA, | ) | AND JUDGMENT* |
| DEPARTMENT OF HEALTH & | ) | |
| SOCIAL SERVICES, OFFICE OF | ) | No. 1417 – April 11, 2012 |
| CHILDREN'S SERVICES, | ) | |
| | ) | |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, William F. Morse, Judge.

Appearances: Marjorie K. Allard, Assistant Public Defender, and Quinlan G. Steiner, Public Defender, Anchorage, for Appellant. Megan R. Webb, Assistant Attorney General, Anchorage, and John J. Burns, Attorney General, Juneau, for Appellee. Lisa Wilson, Assistant Public Advocate, and Richard Allen, Public Advocate, Anchorage, Guardian Ad Litem.

Before: Fabe, Winfree, and Stowers, Justices. [Carpeneti, Chief Justice, and Christen, Justice, not participating.]

---

\*     Entered pursuant to Appellate Rule 214.

## I. INTRODUCTION

Patience gave birth to Ethan in June 2010 in Anchorage.[1] Due to Patience's use of cocaine and her long history of substance abuse and criminal activity, the State of Alaska, Office of Children's Services (OCS) filed a petition to terminate her parental rights in February 2011.

Patience's termination of parental rights trial took place on August 3, 2011, but because OCS was unable to serve Ethan's father with notice of the trial, his termination trial was scheduled for November 16, 2011. Superior Court Judge William F. Morse found Ethan was a child in need of aid under AS 47.10.011(10) (substance abuse), and that Patience had not remedied that conduct. The superior court then found, by clear and convincing evidence, that "the department has complied with the provisions of AS 47.10.086 regarding reasonable efforts." The court also found, by a preponderance of the evidence, "that termination of parental rights is in the best interests of [Ethan]."

Patience appeals, arguing she was not given a reasonable opportunity to remedy her behavior, OCS did not meet its reasonable efforts requirement, and terminating her parental rights was not in Ethan's best interests.

We affirm the decision of the superior court on all grounds.

## II. FACTS AND PROCEEDINGS

Patience gave birth to Ethan in June 2010 in Anchorage. Ethan is Patience's tenth and last child, as Patience underwent tubal ligation after Ethan's birth.[2]

---

[1] We use pseudonyms to protect the privacy of the parties.

[2] Patience voluntarily relinquished custody of her nine other children after OCS involvement due to Patience's substance abuse.

Patience has a long history of cocaine addiction and related criminal activity,[3] but at the time of Ethan's birth, both she and Ethan tested drug free.

Jessica Gardner, an OCS worker, visited Patience in the hospital three days after Ethan's birth. According to Gardner, Patience was interacting well with Ethan and was beginning to bond with him. Gardner conducted a home visit with Patience two weeks after Ethan's birth and found Patience was appropriately tending to Ethan. During that home visit, Gardner discussed potential in-home services available to Patience: the Open for Services Unit, which is a voluntary program that would have provided Patience with home visits once or twice a week, substance abuse treatments, and parenting classes. According to Gardner, Patience wanted some time to think about whether she wished to participate in this program.

Shortly after Ethan's birth, Patience's mother died of leukemia. Also, "very soon after the baby was born," Patience's probation officer, Genevieve Haskins, received reports that Patience was using crack cocaine again. On July 19, Patience contacted her probation officer and admitted she had been using crack cocaine and was afraid Ethan would be taken from her. Haskins asked Patience to come in for drug testing, but Patience refused.

During the month of July, Gardner attempted to contact Patience regarding Ethan but was unsuccessful. Gardner learned that Ethan was being watched by an adult whose identity and location Gardner could not determine. Gardner was eventually able to locate Patience, and on August 3 Gardner met with her in the Anchorage jail,[4] but Patience was belligerent and Gardner was unable to determine Ethan's whereabouts.

---

[3]    Patience first used cocaine when she was 15 and by the time she was 22 she was using cocaine regularly. At the time of trial she was 42.

[4]    Patience had been arrested for criminal trespass.

On August 18, Gardner visited with Patience at Hiland Mountain Correctional Center[5] and learned the name and location of Ethan's temporary guardian, Ginger, whom Patience had provided with a signed delegation of parental rights. After meeting with Ginger, Gardner checked Ginger's background and learned she had a criminal history and a history with OCS due to her own substance abuse and neglect. Gardner also discovered that one of the other adults in Ginger's home was a registered sex offender. Concerned for Ethan's safety, Gardner spoke with Patience about removing Ethan from Ginger's care and placing him in OCS custody. When Gardner met with Patience again at Hiland, Patience provided Gardner with a signed revocation of the delegation of parental rights. With no relatives interested in taking custody of Ethan, he was placed in foster care and remained in the same foster home through the time of trial.

After Ethan was placed in foster care in September 2010, Gardner worked with Patience to create a case plan for her, which included substance abuse assessment and treatment, parenting classes at Hiland, and vocational classes. Gardner referred Patience to the Salvation Army Clitheroe Center for substance abuse assessment, which Clitheroe could conduct over the phone or at Hiland.

Patience was released from jail on October 22, 2010, and was supposed to report to her probation officer on the next business day. Instead, Patience relapsed on the morning of October 23, and was not in contact with her probation officer or OCS until she was arrested on an outstanding warrant on December 4, 2010.[6]

---

[5]     Patience had pleaded guilty to Fourth Degree Misconduct Involving A Controlled Substance and was sentenced to 36 months incarceration with 33 months suspended and three years probation.

[6]     The warrant had been issued after her failure to report to her probation
(continued...)

When Patience was arrested, she had a crack pipe on her person and urine tests confirmed she had recently used crack cocaine. Patience's OCS social worker at the time, David Pieper, met with her in jail and encouraged her to participate in a correctional center substance abuse program, RSAT. Patience enrolled in the RSAT program, however she was discharged from this program on April 5, 2011 for lying, manipulating, failing to take responsibility for her actions, and for being treatment resistant.

During this time, Patience's relationship with Ethan had deteriorated. Ethan had bonded with his foster mother, and spent most of his visits with Patience crying or simply not interacting with her. In February 2011, about six months after Ethan entered State custody and eight months after he was born, and while Patience was still enrolled in the RSAT program, OCS filed a petition to terminate Patience's parental rights, as well as the parental rights of Ethan's biological father. In mid-July, shortly before trial, Patience entered Clitheroe for treatment.

Patience's termination trial took place on August 3, 2011, but because OCS was unable to serve Ethan's father, his termination trial was scheduled for November 16, 2011. The superior court found that Ethan was a child in need of aid under AS 47.10.011(10) (substance abuse) and that Patience had failed to remedy the conduct that made Ethan a child in need of aid. The court also found that Patience was "tremendously vulnerable [to relapse] because of [her] long history of addiction."

---

[6]    (...continued)
officer.

With respect to AS 47.10.086's reasonable efforts requirement[7] the court found, by clear and convincing evidence, that "the department has complied with the provisions . . . regarding reasonable efforts," and also that termination of Patience's parental rights was in Ethan's best interests. The court explained:

> I think the department acted to some extent the way most people would have when they got this case, which was nine children have been terminated, and there's no hope. And, you know, I don't think it would have made any difference, unfortunately. But to sort of say to her, here's an application, fill out the application, that's pretty weak. Or find yourself a rehab program.[8]

> Nonetheless, given her history, given her conduct throughout the course of the contact, the way that she immediately upon release would not contact . . . OCS[, but] immediately would go . . . into hiding, means that the efforts that the department made were reasonable.

## III. STANDARD OF REVIEW

We review factual findings regarding termination of parental rights for clear error.[9] "The superior court's finding that a parent has failed to timely remedy the harmful conduct or conditions that place a child at substantial risk of harm, and the court's determination that terminating parental rights is in the child's best interest" are

---

[7]  AS 47.10.086 states: "the department shall make timely, reasonable efforts to provide family support services to the child and to the parents or guardian of the child that are designed to prevent out-of-home placement of the child or to enable the safe return of the child to the family home . . . ."

[8]  As we discuss in Part IV.B, *infra*, OCS actually made more efforts than superior court's comments indicate.

[9]  *Ralph H. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 255 P.3d 1003, 1007-08 (Alaska 2011).

factual findings we review for clear error.[10] Whether the State has complied with the "reasonable efforts" requirement is a mixed question of law and fact.[11] Factual findings are clearly erroneous only if, "after a review of the entire record in the light most favorable to the party prevailing below, we are left with a definite and firm conviction that a mistake has been made."[12] "Whether the superior court's factual findings comport with the requirements of the CINA statutes is a question of law reviewed de novo."[13] We review de novo questions of law.[14]

## IV.  DISCUSSION

### A.  The Superior Court Did Not Err When It Found Patience Had Not Timely Remedied The Harmful Conduct In Question.

In order to terminate parental rights, the superior court must find, by clear and convincing evidence, that the parent "has not remedied the conduct or conditions in the home that place the child at substantial risk of harm," or the parent "has failed, within a reasonable time, to remedy the conduct . . . that place[s] the child in substantial risk."[15] Reasonable time is "a period of time that serves the best interests of the child, taking in

---

[10]     *Id*.

[11]     *See Janice B. v. State, Dep't of Health & Soc. Servs., Div. of Children's Servs.*, Mem. Op. & J. No. 1325, 2009 WL 50138 at *2 (Alaska Jan. 7, 2009) ("Whether OCS made reasonable efforts to provide family support services is a mixed question of law and fact."); *see also N.A. v. State*, 19 P.3d 597, 600-01 (Alaska 2001) ("Whether the state has complied with the 'active efforts' requirement of the Indian Child Welfare Act (ICWA) presents a mixed question of law and fact.").

[12]     *Ralph H.*, 255 P.3d at 1008.

[13]     *Id*.

[14]     *A.A. v State, Dep't of Family & Youth Servs.*, 982 P.2d at 256, 259 (Alaska 1999).

[15]     AS 47.10.088(a)(2).

account the affected child's age, emotional and developmental needs, and ability to form and maintain lasting attachments."[16]

When determining whether a parent has failed to remedy the relevant conduct within a reasonable period of time, the superior court may consider, among other factors, "the likelihood that the harmful conduct will continue" and "the history of conduct or conditions created by the parent."[17] The court here found that Patience was "tremendously vulnerable" to relapse, given her "long history of addiction." The court noted Patience's participation in a treatment program shortly before trial was "commendable, but simply insufficient."

In her brief, Patience emphasizes "the petition to terminate parental rights was filed after Ethan had been in [S]tate custody for less than six months," and the termination trial itself took place "after less than a year of [S]tate custody." In other cases, Patience argues, it is "not unusual for a child to have been in [S]tate custody for close to two years . . . at the time of the termination trial." However, she presents no case law that suggests a six-month to one-year time period is legally insufficient. To the contrary, we have held in cases such as *Christina J. v. State, Department of Health and Social Services, Office of Children's Services*[18] and *Barbara P. v. State, Department of*

---

[16]    AS 47.10.990(28).

[17]    AS 47.10.088(b)(4), (5).

[18]    254 P.3d 1095, 1107 n.25 (Alaska 2011) ("In cases where OCS has petitioned for termination less than one year after taking custody of an infant, there is typically a history of OCS involvement with the parents' older children."). In Patience's case, OCS had been involved with her nine children born before Ethan because of the same harmful conduct — Patience's addiction to cocaine. She voluntarily relinquished her parental rights to all nine children.

*Health and Social Services, Office of Children's Services*[19] that an abbreviated period between taking a child into State custody and termination proceedings was legally acceptable under circumstances similar to Patience's case. When deciding to terminate Patience's parental rights, the superior court considered statutorily valid and highly relevant factors, such as Patience's lengthy history of drug abuse and the high probability of a relapse on her part.[20]

Given Patience's continuing struggles with addiction in the years preceding Ethan's birth and in the first months of Ethan's life and her pattern of relapse upon release from custody, we are not left with a firm conviction that the superior court erred. We affirm the superior court's finding that Patience failed to remedy her conduct within a reasonable period of time.

## B.    The Superior Court Did Not Err When It Found OCS Provided Reasonable Efforts.

Before the superior court may terminate parental rights, it must find by clear and convincing evidence that OCS made "reasonable efforts to provide family support services to the child and to the parents . . . that are designed to prevent out-of-home placement of the child. . . ."[21] The reasonableness of OCS's efforts at reunification "must be viewed in light of the entire history of services that the [S]tate had already

---

[19]    234 P.3d 1245, 1251-53 (Alaska 2010) (finding parental failure to remedy even though OCS filed the petition to terminate parental rights the month after the youngest child's birth and the termination trial was held a year later).

[20]    AS 47.10.088(a)(2). As noted above, Patience first used cocaine when she was 15 and in the course of this case quickly relapsed after Ethan's birth and then again after being released from custody following arrest for drug-related offenses.

[21]    AS 47.10.086(a); CINA Rule 18(c).

provided."[22] We have also held that a parent's "failure to participate in his [or her] case plan" may be considered in determining whether the State has made reasonable efforts.[23]

As explained above, various OCS employees worked with Patience after Ethan's birth to develop case plans with her, arrange visitation with Ethan, and help her enroll in rehabilitation programs. OCS made similar efforts for Patience with respect to her ninth child. "The efforts that OCS makes must be reasonable but need not be perfect. OCS's efforts must be evaluated in light of the circumstances of each particular case, including the parent's actions or inaction. The reasonableness of the [S]tate's efforts must be viewed in light of the entire history of services that the [S]tate had already provided."[24]

Although the superior court referred to some of OCS's efforts as "pretty weak," and suggested that OCS might have believed there was "no hope" for Patience, the court also found it did not believe additional efforts "would have made any difference." More importantly, OCS's efforts were reasonable under the circumstances. OCS was in contact with Patience from the time of Ethan's birth and it offered her in-home services. OCS worked with her to develop case plans, made efforts to locate Patience when she fell out of contact, arranged to remove Ethan from a potentially dangerous placement, and discussed with Patience the RSAT program and Clitheroe for

---

[22]    *Erica A. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 66 P.3d 1, 7-8 (Alaska 2003) (finding "the court was entitled to consider the division's extensive history of efforts and [the appellant's] consistent lack of success at addressing problems. When viewed in light of this history, the superior court's finding of reasonable efforts is not clearly erroneous.").

[23]    *Sean B. v. State, Dep't of Health & Soc. Servs.*, 251 P.3d 330, 338-39 (Alaska 2011).

[24]    *Audrey H. v. State, Office of Children's Servs.*, 188 P.3d 668, 678 (Alaska 2008) (internal quotations and citations omitted).

substance abuse assessment. For her part, Patience at times failed to keep in contact with OCS, went into hiding after her relapse out of fear she would lose custody, failed to cooperate with her RSAT substance abuse treatment program, and, in short, demonstrated no substantial willingness and ability to achieve meaningful sobriety.

Viewed in the light most favorable to the State, there is nothing in the record to cause us to have a "firm conviction that a mistake has been made"[25] with respect to the superior court's determination that OCS met its reasonable efforts requirement under the totality of circumstances.

### C. The Superior Court Did Not Err When It Found It Was In Ethan's Best Interests To Terminate Patience's Parental Rights Even Though Ethan's Father's Rights Had Not Yet Been Terminated.

Patience's termination of parental rights trial took place on August 3, 2011, while Ethan's father's termination of parental rights trial was scheduled to take place on November 16, 2011. Patience argues that it was not in Ethan's best interests to terminate her parental rights before Ethan's father's parental rights were terminated because this would render Ethan a "half-orphan" under the standard set forth in *A.B. v. State, Department of Health and Social Services*.[26]

But Ethan's father's parental rights were terminated following trial on November 16, 2011. Therefore, delaying Patience's termination trial until Ethan's father's trial would not have had any impact on the superior court's decision or on the outcome of this appeal. The superior court was concerned with Patience's vulnerability to and likelihood of relapse, and found her recently-begun participation in a rehabilitation program to be "insufficient." We have determined the court's concerns

---

[25] *Ralph H. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs*, 255 P.3d 1003, 1008 (Alaska 2011).

[26] 7 P.3d 946 (Alaska 2000) (discussed *infra*).

were justified. Delaying Patience's trial for less than four months would not have impacted the court's assessment.

Furthermore, the court's finding that terminating Patience's parental rights was in Ethan's best interests was not clear error. Patience heavily relies on *A.B. v. State*, where we remanded a case in which the superior court had terminated the mother's parental rights while leaving intact the father's parental rights.[27] The purpose of the remand was to determine "whether termination of [the mother]'s parental rights is for the purpose of freeing [the child] for adoption or other permanent placement."[28] In *A.B.* we were concerned with the child's "half-orphaned" status, but only because "[the child] would lose her rights of inheritance . . . and her right to support from her biological mother. With her biological father as her custodian, losing these important rights for her other natural parent would not appear to be in [the child's] best interests."[29]

The decision in *A.B.* was subsequently limited to the specific facts of that case: when the superior court terminates parental rights for the purpose of freeing the child for adoption or other permanent placement, we are not concerned with the "half-orphan" status of the child as we were in *A.B.*[30] In Ethan's case, OCS sought to terminate

---

[27]     *Id*. at 954.

[28]     *Id*.

[29]     *Id*. at 955.

[30]     *See Louise A. v. State, Div. of Family & Youth Servs.*, No. S-11048, 2004 WL 541373, at *3 (Alaska March 17, 2004) ("*A.B.* does not apply where the [S]tate seeks to terminate both parent[s'] rights."); *S.H. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 42 P.3d 1119, 1125 (Alaska 2002) ("*A.B.* stands for the proposition that the risk of a child being 'half-orphaned' should be considered in the best interests analysis where DFYS seeks to terminate only one parent's rights and the child will remain in the other parent's custody."); *A.H. v. State, Dep't of Health & Soc. Servs.*,

(continued...)

Patience's and the father's parental rights with the intent of freeing Ethan for adoption by his current foster parents. The superior court actually terminated both parents' parental rights, though in two separate proceedings. The concerns addressed in *A.B.* are not present in this case. We affirm the superior court's decision that terminating Patience's parental rights to Ethan was in his best interests.

## V.    CONCLUSION

We AFFIRM the superior court on all grounds.

---

[30]    (...continued)
10 P.3d 1156, 1166 (Alaska 2000) (affirming a termination of the father's parental rights even though the mother's rights had not been terminated after finding, "[h]ere, [in contrast to *A.B.*], the State petitioned to terminate the parental rights of both [parents], planning to free the children for adoption.").