NOTICE
*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| ROCK H.,<br><br>     Appellant,<br><br>  v.<br><br>STATE OF ALASKA, DEPARTMENT<br>OF HEALTH & SOCIAL SERVICES,<br>OFFICE OF CHILDREN'S SERVICES,<br><br>     Appellee. | Supreme Court No. S-18160<br><br>Superior Court No. 3KN-19-00077 CN<br><br>MEMORANDUM OPINION<br>AND JUDGMENT*<br><br>No. 1902 – June 22, 2022 |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Kenai, Lance Joanis, Judge.

Appearances: Olena Kalytiak Davis, Anchorage, for Appellant. Anna Jay, Assistant Attorney General, Anchorage, and Treg R. Taylor, Attorney General, Juneau, for Appellee.

Before: Winfree, Chief Justice, Maassen, Carney, Borghesan, and Henderson, Justices.

## I. INTRODUCTION

A father appeals the superior court's termination of his parental rights to his young daughter. He disputes two findings made by the superior court: first, that his daughter was a child in need of aid based on abandonment, neglect, and physical harm; and second, that the Office of Children's Services (OCS) made reasonable efforts toward

---

\*   Entered under Alaska Appellate Rule 214.

family reunification. We conclude that the superior court did not err in its findings or its application of the law and therefore affirm the termination order.

## II.     FACTS AND PROCEEDINGS

### A.     Facts

Liv was born in Soldotna in late August 2019 to Elaine M. and Rock H.[1] At the hospital both Liv and Elaine tested positive for a number of controlled substances, and Liv suffered withdrawal symptoms. The hospital made a report to OCS; an OCS worker visited Liv and Elaine in the hospital and conducted an initial assessment. Elaine told OCS that Rock was Liv's father.

OCS assumed temporary emergency custody of Liv on September 6, though she remained in the hospital for a few more days. On September 9 OCS filed an emergency petition for adjudication of Liv as a child in need of aid (CINA). Rock attended an emergency hearing that day, but OCS did not consider placing Liv with him because of his prior involvement with OCS, "his criminal history[, and] concerns of substance use." When Liv was discharged from the hospital she was placed in a foster home in Kenai, where she remained at the time of trial.

Rock took a paternity test, but he told OCS that he and Elaine were no longer in a relationship and that he was unaware of the extent of her drug use. He also said he had graduated from a substance abuse treatment program the year before but had suffered several relapses since then.

Rock had his first visit with Liv on September 16 and attended a hearing later that day. OCS made a family contact plan for him. But in October he cancelled or failed to attend five scheduled visits, after which OCS suspended visitation.

---

[1]     Pseudonyms are used to protect the privacy of the family. Elaine relinquished her parental rights in 2021.

The case was transferred to a second OCS caseworker later in 2019. Rock was living in Wasilla. When the caseworker first reached Rock he said he wanted to wait until his paternity was confirmed before visiting Liv again; thereafter he was difficult to reach. The caseworker testified that as the case moved forward he tried unsuccessfully to get in touch with Rock each month by calling and texting him.

In December 2019 the caseworker prepared a case plan for Rock, again without Rock's participation.[2] The plan listed several goals for Rock: receive an integrated substance abuse and behavioral health assessment and follow its recommendations, participate in case planning and engage with OCS, attend parenting classes, and attend job skills training. OCS's next steps were also identified: "Once mother [sic] decides to participate in any way the case worker will make referrals." Under the heading "Protective factors the parent/caregiver has and needs to be protective of their child(ren)," the plan recites, after each of the five factors, "[Rock] has not came [sic] in and has not been responsive to requests to meet." OCS sent a copy of the plan to Rock's attorney.

OCS later learned that Rock had been incarcerated at Wildwood Correctional Center as of November 2019. As Rock's paternity had recently been confirmed, OCS brought Liv to Wildwood for two one-hour visits with him, on February 13 and March 9. The caseworker discussed the case plan with Rock and talked about drug use, possible assessments and treatments, and his transportation needs. Rock told the caseworker that he wanted to care for Liv if Elaine could not do so, and that he was interested in getting an assessment and treatment quickly. But OCS did not make an

---

[2] This second caseworker also knew Rock from previous employment as a probation officer, which the caseworker testified gave him "a little background . . . that a normal caseworker wouldn't" have; the caseworker agreed at trial that he and Rock "were on familiar terms."

assessment referral for Rock at that time because the assessment would only be valid for six months, Rock did not have a firm release date, and any services recommended by the assessment would likely not be available in prison.

The March visit at Wildwood was the last because of the COVID-19 pandemic. Phone visits were not practical given Liv's young age, and Wildwood did not have videoconference capability. OCS referred Rock to the prison's Narcotics Anonymous program, but other services were limited due to both the pandemic and staffing shortages. Rock and the caseworker spoke in May and June; in May Rock told the caseworker he thought he would be released soon. When the caseworker tried to reach Rock in late June he was told that Rock had been released.

About two weeks after leaving Wildwood, Rock, without OCS assistance, began a long-term inpatient treatment program at the Seaview Center in Seward. The caseworker eventually learned he was there,[3] and through Rock's attorney he got a release of information allowing OCS to confirm Rock's presence at Seaview and to contact him there. When Rock and the caseworker spoke again, Rock expressed an interest in restarting visits with Liv, but because Liv was traveling out of state, visits did not occur right away.

In early October 2020 a third Kenai-based OCS worker assumed responsibility for the case. He texted Rock to set up a meeting but did not hear back. Later that month the caseworker updated Rock's case plan without having spoken to him. Under the "Protective factors" heading the new plan recites, for each of the five factors, "Unknown at this time. [Rock] is currently in treatment and [has] not been available for

---

[3] Rock testified that he told OCS he was at Seaview, but the superior court found that his caseworker "actually found out from the jail that [Rock had] gone to Seaview and then couldn't reach him until he received [a release of information]" allowing the contact.

case planning." The plan recommends that Rock receive an integrated assessment and follow its recommendations, listing several Kenai-area treatment centers (though not Seaview) as possible providers.[4] The plan lists other activities for Rock as well: participation with OCS on his case plan, parenting classes, job skills training, and consistent family contact. Rock did not sign the plan, but the caseworker testified that Rock was later made aware of it. No referrals were made based on this plan.

On October 29 the third caseworker spoke with Rock for the first time by phone. Rock again requested virtual visits with Liv, which OCS set up. Rock attended two visits in November and missed one on December 7. He graduated from Seaview on December 10. He moved to Kenai and then Anchorage, looking for a sober-living facility, but could not find one that would take him. He was required by the Department of Corrections' Pretrial Enforcement Division to submit to random urinalyses (UAs); all his UAs were negative. The testing facility was in Wasilla, however, which limited his ability to be near Liv, who remained in the Kenai foster home. On December 14 Rock attended another virtual visit with Liv.

The caseworker and Rock spoke a few days later, and Rock told the caseworker about his UAs and weekly outpatient services he was receiving through Seaview's aftercare program. Rock had a virtual visit with Liv on December 21. But after he missed three scheduled visits in January, OCS again suspended visitation.

Rock's caseworker attempted to maintain contact by telephone and text message. Their last contact was in December 2020 or January 2021, when Rock told OCS he was in Anchorage and needed transportation assistance, and the caseworker

---

[4]     This caseworker testified at trial that when he updated the case plan he did not know that Rock was at Seaview, even though the case transfer note said Rock was at a Seward treatment center. The superior court found that the new caseworker "should have known that [Rock] was in treatment . . . but for some reason [he] didn't know that."

responded by mailing passes to the Anchorage OCS office. The caseworker tried unsuccessfully to reach Rock a few times a month in January, February, and March. After these attempts, the caseworker also searched a database to see whether he was back in jail. The caseworker did not make a referral to the Anchorage OCS office or seek to have a secondary, Anchorage-based caseworker assigned to the case; he explained that such a referral would ordinarily wait until the parent had remained "in whatever region that is for at least three months," and once he lost touch with Rock he "wouldn't have known" if that was the case. OCS also did not reach out to the Pretrial Enforcement Division to get in touch with Rock, and it never sought a release of information to monitor the results of Rock's UAs. At trial, Rock explained that he fell out of contact with OCS and missed visits because he was homeless and his phone kept dying.[5]

Rock relapsed at the end of April 2021. In March or April he was sentenced on charges from April 2020, remanded to jail, then moved to a halfway house in Anchorage.

In April and May the case was briefly transferred to a fourth OCS worker. No testimony was offered about this time period at trial.

In the beginning of June the case was returned to the third caseworker. He learned through a database search that Rock was in custody and got in touch with him in early June. No new family contact plan had been created as of the trial, although Rock said he was interested in restarting visitation. At trial, in late June, Rock anticipated that he would be released in September.

---

[5] At trial the court admitted a collection of records from Seaview regarding the treatment Rock received there. These notes indicate that Rock continued to attend some virtual therapy services after moving to Anchorage and losing touch with OCS.

**B.	Proceedings**

OCS petitioned to terminate Rock's parental rights in August 2020. A termination trial was held in late June 2021, following which the superior court issued an order terminating Rock's parental rights. The court found that Liv was a child in need of aid due to abandonment, substantial physical harm (based on Liv's drug addiction at birth), and neglect. The court also found that "OCS made timely reasonable efforts . . . to enable the safe return of the child to the family home, but the efforts were not successful."

Rock appeals the termination order.

## III.	STANDARD OF REVIEW

"In a child in need of aid case, we will sustain a superior court's findings of fact unless they are clearly erroneous."[6] Factual findings "are clearly erroneous if a review of the entire record in the light most favorable to the party prevailing below leaves us 'with a definite and firm conviction that a mistake has been made.' "[7] "The issue of whether a trial court's findings satisfy the relevant statutory requirements is a question of law that we review de novo."[8] "We 'bear in mind at all times that terminating parental rights is a drastic measure.' "[9]

---

[6]	*Brynna B. v. State, Dep't of Health & Soc. Servs., Div. of Fam. & Youth Servs.*, 88 P.3d 527, 529 (Alaska 2004).

[7]	*Id.* (quoting *A.B. v. State, Dep't of Health & Soc. Servs.*, 7 P.3d 946, 950 (Alaska 2000)).

[8]	*Id.*

[9]	*Jon S. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 212 P.3d 756, 761 (Alaska 2009) (quoting *Karrie B. ex rel. Reep v. Catherine J.*, 181 P.3d 177, 184 (Alaska 2008)).

## IV. DISCUSSION

### A. The Superior Court Did Not Err When It Found That Liv Was A Child In Need Of Aid Due To Abandonment.

The superior court found that Liv was a child in need of aid on three grounds: abandonment, neglect, and substantial physical harm. We agree that Liv was a child in need of aid due to abandonment, and because we affirm the superior court's finding on that ground we do not reach the others.[10]

A court may find that a child is in need of aid when the "parent . . . has abandoned the child . . . and the other parent is absent or has committed conduct or created conditions that cause the child to be a child in need of aid."[11] Abandonment may be found based on the parent's "conscious disregard of parental responsibilities toward the child by failing to provide reasonable support, maintain regular contact, or provide normal supervision, considering the child's age and need for care by an adult."[12] Alaska Statute 47.10.013(a) lists eight different grounds that support a finding of abandonment if they occur without "justifiable cause." The superior court found that Rock had

---

[10] *See Annette H. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 450 P.3d 259, 265-66 (Alaska 2019) ("We need not consider each of the grounds [for CINA status] . . . if we determine that the record supports any one of the superior court's child in need of aid findings; we may affirm that finding without considering the other grounds.").

[11] AS 47.10.011(1). Because Elaine has relinquished her parental rights, the second condition is met.

[12] AS 47.10.013(a).

abandoned Liv on four of these grounds,[13] including by making only minimal efforts to support and communicate with her.[14]

Rock argues, however, that "[h]e spent the entire case working independently — without a valid OCS case plan or input, much less assistance — toward" reuniting with Liv. He claims that he "immediately" expressed interest in seeking treatment and parenting his daughter; he testified at trial that his "primary goal trying to work on [his] treatments [was to be] safe and sober to reunify with [Liv]."

Rock's argument finds support in the trial testimony. One of his caseworkers testified that in early 2020 Rock "expressed interest in getting an assessment, getting into treatment right away," and said that if Elaine "couldn't take care of [Liv] he wanted to be there for her." But notwithstanding Rock's motivation for pursuing treatment, we cannot say that the superior court clearly erred in finding that he failed to make more than "minimal efforts" to support and communicate with his daughter. After attending one visit in September 2019 Rock missed the next five, leading to the suspension of visits. Rock next saw Liv when OCS brought her to

---

[13]    The superior court also applied the common law test for abandonment that we disavowed several years ago in light of the legislature's more precise definitions. *See Steve H. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 444 P.3d 109, 113 (Alaska 2019) ("Because termination of parental rights is based on statute, a court must find that a parent's conduct satisfies the statutory criteria before it can order termination."). The court's erroneous consideration of the common law abandonment test in this case is harmless given its other statute-based grounds for finding CINA status.

[14]    AS 47.10.013(a)(2). "[T]he various ways abandonment can be shown under AS 47.10.013(a) are listed disjunctively, and a single adequately supported finding is therefore enough to establish that [a child] was a child in need of aid." *Trevor M. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 368 P.3d 607, 610 (Alaska 2016).

Wildwood for two visits in early 2020. Visits were then halted due to COVID-19. We of course do not fault Rock for the suspension of visitation due to Wildwood's pandemic restrictions. At the same time, however, we cannot say that the superior court clearly erred when it found that Rock "fell . . . off the radar and out of contact" after his release from Wildwood, and that OCS was able to reestablish contact with him only after it "found out from the jail that [he was in] Seaview and then [OCS] couldn't reach him" there until it received a signed release of information. After leaving Seaview Rock again failed to attend visits with Liv consistently, missing four Zoom visits between December 2020 and January 2021 and leading OCS to suspend visitation again. It was not clear error to find that seven visits over 22 months — along with a lack of evidence that Rock made any other attempts at communication or relationship-building — amounted to no more than "minimal efforts" to support and communicate with Liv and thus "abandonment" as the legislature has defined it.[15]

Rock argues that he is not to blame for the limited visitation. He points instead to OCS's failings, the pandemic, and Liv's young age, which made phone visits impractical. But we disagree with his assertion that OCS merely "doled out" visitation

---

[15]     Rock disputes the accuracy of OCS's trial exhibit purporting to list all of his visits with Liv, including those that were cancelled or at which he was a no-show. He claims that "the record is unclear on how many visits were actually ever offered to [him], at Wildwood, much less further into the case," and that his caseworker exaggerated the number of visits that were attempted. The caseworker testified that before Wildwood shut down due to the pandemic, he "was attempting to [take Liv to visit] every couple of weeks," but "it was closer to once a month and . . . twice a month sometimes." The caseworker explained that these visits began when Elaine was incarcerated at Wildwood in October 2019 and that Rock was not incarcerated there until later in 2019 or early 2020. The caseworker stated that he took Liv to visit Rock "two or three" times. This testimony is consistent with the superior court's finding that "the visits . . . [on] February 13th and March 9th were the in-custody Wildwood visits"; this finding is not clearly erroneous.

"in bite sized portions."  OCS coordinated visits and stopped only after Rock missed a number of visits consecutively.[16]  The court could reasonably find fault with Rock not for the limited number of visits that took place while he was in custody but rather for his failure to consistently attend visits when he was not.

The court did not clearly err when it found that Rock, without justifiable cause, made only minimal efforts to communicate with and support Liv.  On that basis we affirm the court's finding that Liv was a child in need of aid due to abandonment.

**B.    The Superior Court Did Not Err When It Found That OCS Made Reasonable Efforts To Reunite Rock And Liv.**

Rock also disputes the superior court's finding that OCS made "timely, reasonable efforts to provide family support services" with the aim of reuniting him with Liv.[17]  OCS must make reasonable efforts before seeking to terminate parental rights; reasonable efforts involve " '(1) identify[ing] family support services that will assist the parent . . . in remedying the conduct or conditions in the home that made the child a child in need of aid' and '(2) actively offer[ing] the parent . . . and referr[ing] the parent' to these services."[18]  OCS "has some discretion both in determining what efforts to pursue and when to pursue them."[19]  "In making . . . reasonable efforts . . . , the primary

---

[16]    *Cf. Audrey H. v. State, Off. of Child.'s Servs.*, 188 P.3d 668, 680-81 (Alaska 2008) (affirming superior court's finding of reasonable efforts when OCS twice suspended visits due to mother's lack of attendance and failure to keep in touch with OCS).

[17]    AS 47.10.086(a); AS 47.10.088(a)(3).

[18]    *Joy B. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 382 P.3d 1154, 1164-65 (Alaska 2016) (alterations in original) (quoting AS 47.10.086(a)(1)-(2)).

[19]    *Sherman B. v. State,  Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*,
(continued...)

consideration is the child's best interests."[20]  And "the scope of OCS's duty to make reasonable efforts is affected by a parent's incarceration."[21]

"In reviewing whether OCS made reasonable efforts, a court considers the [S]tate's reunification efforts in their entirety."[22]  "The court must first identify the problem that caused the children to be in need of aid and then determine whether OCS's efforts were reasonable in light of the surrounding circumstances."[23]  These circumstances may include "the parent's substance abuse history, if there is one; [his] willingness to participate in treatment; the history of services provided by OCS; and the parent's level of cooperation with OCS's efforts."[24]  However, "even if the outlook is bleak and the likelihood of success is low," the obligation to make reasonable efforts persists.[25]

The superior court found that OCS created a family contact plan, provided Rock with a call-in number for court, created case plans, "offered or suggested parenting

---

[19]     (...continued)
290 P.3d 421, 432 (Alaska 2012).

[20]     AS 47.10.086(f).

[21]     *Barbara P. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 234 P.3d 1245, 1262 (Alaska 2010).

[22]     *Id.*

[23]     *Id.*

[24]     *Shirley M. v. State*, *Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 342 P.3d 1233, 1241 (Alaska 2015) (footnotes omitted).

[25]     *Kylie L. v. State, Dep't of Health & Soc. Servs., Off. of Child's Servs.*, 407 P.3d 442, 448 (Alaska 2017).

classes," "offered or suggested . . . random drug tests,"[26] regularly tried to locate Rock and get in touch with him,[27] and facilitated visitation with Liv.[28] The court also cited Rock's "persistent lack of success," stating that "once he is not in a position where he's a captive audience, his level of interest and his actions demonstrate that he is not interested in participating in an effort to reunify with his child." The court found that OCS did not make reasonable efforts in March, April, and May 2021, but it concluded that OCS's efforts were nonetheless reasonable overall. The evidence supports these findings, and they are not clearly erroneous.

---

[26] The drug tests, though not provided by OCS, were nonetheless an effort by the State. *Clark J. v. State Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 483 P.3d 896, 901 (Alaska 2021) ("When analyzing whether the State has made these active efforts [under the Indian Child Welfare Act of 1978] courts may consider services provided by state agencies other than OCS . . . ."). The reasoning in active efforts cases is applicable to cases that only require reasonable efforts because "active efforts" is "more demanding." *See Winston J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 134 P.3d 343, 347 n.18 (Alaska 2006))).

[27] We have stated that "[f]ailed attempts to contact the parent or obtain information from [him] may qualify as active efforts if the parent's evasive or combative conduct 'rendered provision of services practically impossible.' " *Sylvia L. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 343 P.3d 425, 433 (Alaska 2015) (quoting *E.A. v. State, Div. of Fam. & Youth Servs.*, 46 P.3d 986, 990 (Alaska 2002)); *see also* Dara S. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 426 P.3d 975, 989 n.26 (Alaska 2018).

[28] OCS is required to "provide reasonable visitation between the child and the child's parents," and "[w]hen determining what constitutes reasonable visitation . . . , [OCS] shall consider the nature and quality of the relationship that existed between the child and the [parent] before the child was committed to the custody of [OCS]." AS 47.10.080(p). It was not clear error for the court to find that OCS's decisions to suspend visitation twice due to Rock's repeated failure to attend were reasonable. *See Audrey H. v. State, Off. of Child.'s Servs.*, 188 P.3d 668, 680-81 (Alaska 2008) (affirming finding of reasonable efforts when OCS twice suspended visits due to mother's lack of attendance and failure to keep in touch with OCS).

Rock argues, however, that "next to no effort was put into this case by any of the three [primary] case workers" and points to the "two crude work-shy" case plans. Rock argues that he "was the only one who did draft, and largely execute, without the support of the state, a workable plan" for reunification. He argues that the caseworker who made the December 2019 plan ought to have made a more personalized plan given their prior interactions; he also critiques the plan's failure to list a specific service provider for either an integrated assessment or parenting classes, its suggestion that he attend job skills training in Kenai at a time when he was living in Anchorage, and the plan's mistaken reference to its subject as "mother." He suggests that "[t]he plan was clearly written for someone else and updated only with [Rock's] name." He critiques the second case plan as well, calling it "obviously cribbed like bad homework . . . from [the] old plan" and "wholly ignorant of what transpired in the matter during the preceding year."[29] But despite Rock's concerns with the plans' wording, the superior court did not clearly err when it found that their listed activities were "consistent with the types of services that [Rock] . . . should have been engaging in and was actually actively engaging in at that time."[30]

Rock also argues that OCS failed to provide sufficient referrals to services. However, the caseworker's testimony that he was waiting for Rock to be released from Wildwood before referring him for an assessment supported a finding that OCS acted

---

[29] In support of this claim, Rock points to testimony from OCS workers at the September 2020 permanency hearing. This testimony was not presented or admitted at the termination trial.

[30] Rock also criticizes both caseworkers for testifying that "they did not bother trying to reach Rock before filling in the form plans." But this is not an accurate characterization of their testimony; both testified that they tried to reach Rock and completed the case plans without his involvement only after failing to hear back from him.

reasonably under the circumstances. An assessment conducted while Rock was incarcerated would have had to be redone after six months if he had not been released in the meantime, and Rock did not have a clear release date. "[T]he requirement that the [S]tate offer reunification services is fulfilled by setting out the types of services that a parent should avail himself or herself of in a manner that allows the parent to utilize the services."[31] The superior court could reasonably conclude that creating the case plans and discussing them with Rock were as far as OCS could go in early 2020 given Rock's incarceration, the unclear time line, and the pandemic.

OCS's efforts in this case were not without problems, notably the gap in documented efforts between March and May 2021. But we have affirmed findings of "reasonable efforts overall even when [OCS's] efforts were not reasonable during a particular period of time."[32] Courts view OCS's efforts in their entirety, and the lack of documented efforts for three months in the approximately 22 months from OCS's first contact with Rock to trial is not decisive here.[33] The third caseworker's failure to realize that Rock was at Seaview until late October 2020 was also a misstep, though again the lag in services must be viewed in the context of the entire case. The caseworker did get in touch before Rock left Seaview and coordinated visitation until Rock's attendance again lapsed.

---

**31** *Frank E. v. State, Dep't of Health & Soc. Servs., Div. of Fam. & Youth Servs.*, 77 P.3d 715, 720 (Alaska 2003).

**32** *Barbara P. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 234 P.3d 1245, 1262 (Alaska 2010).

**33** *See Maisy W. v. State Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 175 P.3d 1263, 1269 (Alaska 2008) (finding active efforts requirement satisfied despite the failure to make active efforts for three months during the three-year lifetime of the case).

Rock directs us to the "uncompromising standard" that reasonable efforts imposes, citing *Kylie L. v. State, Department of Health & Social Services, Office of Children's Services*.[34] He argues that "it is beyond clear that an 'uncompromising standard' was never aspired to, much less met, at any point" in this case, characterizing OCS's efforts as not "reasonable much less uncompromising." In *Kylie L.* we held that the superior court erred when it excused reasonable efforts on the rationale that "providing OCS more time would be pointless and harmful to [the child] due to the ruptured mother-child bond"; we wrote that "the 'scope of the State's . . . dut[ies]' may not be varied 'based on subjective, preintervention criteria such as a parent's motivation or treatment prognosis.' "[35] We agree that the "uncompromising standard" requires that "in every CINA case[,] even if the outlook is bleak and the likelihood of success is low, the State has an obligation to provide 'timely, reasonable efforts . . . designed . . . to enable the safe return of the child to the family home.' "[36] This standard is uncompromising in that — aside from a few limited statutory exceptions — it must always be met. The superior court in this case did not find that the reasonable efforts standard did not apply; it found that OCS had satisfied the standard. We conclude that its findings are not clearly erroneous and it did not err in concluding that the standard was met.

## V. CONCLUSION

We AFFIRM the superior court's order terminating Rock's parental rights.

---

[34] 407 P.3d 442, 448 (Alaska 2017).

[35] *Id.* at 447-48 (quoting *A.M. v. State*, 891 P.2d 815, 827 (Alaska 1995), *overruled in part on other grounds by In re S.A.*, 912 P.2d 1235, 1241 (Alaska 1996)).

[36] *Id.* (omissions in original) (quoting AS 47.10.086(a)).